271 P.3d 665

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Brandon VALEROS, Petitioner/Defendant–Appellant.**

**No. SCWC–29044.**

Supreme Court of Hawai'i.

Jan. 27, 2012.

As Amended Feb. 2, 2012.

Karen T. Nakasóne, and Summer Kupau, Deputy Public Defenders, for petitioner/defendant-appellant.

Stephen K. Tsushima, Deputy Prosecuting Attorney, City and County of Honolulu for respondent/plaintiff-appellee.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, DUFFY, and McKENNA, JJ.

Opinion of the Court by ACOBA, J.

We hold in this case that the failure of Plaintiff–Appellee State of Hawai'i (the prosecution) to disclose an alibi-rebuttal witness was a violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 12.1,[1] even though

---

1. HRPP Rule 12.1 (2007) provides, in relevant part as follows:

    (a) **Notice by Defendant.** If a defendant intends to rely upon the defense of alibi, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the prosecutor in writing of such intention and file a copy of such notice with the court.

    (b) **Disclosure of Information and Witnesses.** Upon receipt of notice that the defendant intends to rely upon an alibi defense, the

the witness had been previously listed as the alibi witness of Petitioner/Defendant–Appellant Brandon Valeros (Defendant), but apparently unbeknownst to Defendant became the prosecution's witness. Hence, in the absence of a showing of good cause under HRPP Rule 12.1(f) for granting an exception to the requirements of HRPP Rule 12.1, it was error for the circuit court of the first circuit[2] (the court) to allow that witness to testify in order to rebut Defendant's alibi defense. For the reasons stated herein then, we vacate the court's February 5, 2008 judgment of conviction and sentence of Defendant and the Intermediate Court of Appeals's (ICA) June 3, 2011 judgment filed pursuant to its May 16, 2011 Summary Disposition Order[3] affirming the February 5, 2008 judgment, and remand the case for a new trial.

## I.

On November 6, 2006, Defendant allegedly assaulted Kenneth Ring, the complaining witness (CW), with a collapsible metal baton outside the "Exotic Nights" nightclub (Exotic Nights), near the Ward Avenue and Halekauwila Street intersection in Honolulu. On November 13, 2006, Defendant was charged by Felony Information with Assault in the Second Degree, HRS § 707–711(1)(d) (Supp. 2006).[4]

prosecutor shall inform the defendant in writing of the specific time, date, and place at which the offense is alleged to have been committed. The defendant shall then inform the prosecutor in writing of the specific place at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi. *The prosecutor shall then inform the defendant in writing of the names and addresses of the witnesses upon whom the government intends to rely to establish defendant's presence at the scene of the alleged offense.*

. . . .

**(d) Continuing Duty to Disclose.** *If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under section (b) of this rule, the party shall promptly notify the other party or the party's attorney of the existence and identity of such additional witness.*

**(e) Failure to Comply.** Upon the failure of either party to comply with the requirements of this rule, *the court may exclude the testimony of any undisclosed witness* offered by such par-

## A.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

On March 20, 2007, before trial,[5] Defendant filed a Notice of Alibi pursuant to HRPP Rule 12.1. The prosecution replied that it would rely on CW and CW's friend Robert Miller (Miller), who was with CW on the night in question, to establish that the offense was "committed on November 6, 2006, at approximately 2:20 a.m.[,] at or near the intersection of Halekau[w]ila Street and Ward Avenue[.]" On April 11, 2007, Defendant filed a response, stating that on the date and time of the offense, Defendant was in the "Club Electro" (Club Electro) parking lot in Pearl City, Oahu, with alibi witnesses Jamison Benavides (Benavides) and Timothy Santiago (Santiago). Defendant provided addresses and phone numbers for these witnesses.

Defendant's trial counsel declared that on June 15, 2007, the prosecution informed the court and Defendant that it was having difficulty contacting Defendant's alibi witnesses. On July 18, 2007, David Lee, an investigator for the prosecution (investigator), visited

ty as to the defendant's absence from, or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in the defendant's own behalf.

**(f) Exceptions.** *For good cause shown, the court may grant an exception to any of the requirements of this rule.*
(Emphases added.)

2. The Honorable Virginia L. Crandall presided.

3. *State v. Valeros*, No. 29044, 2011 WL 1909109 (Haw.App. May 16, 2011). The SDO was filed by Presiding Judge Daniel R. Foley and Associate Judges Alexa D.M. Fujise and Katherine G. Leonard.

4. HRS § 707–711(1) provides in relevant part: "(1) A person commits the offense of assault in the second degree if[ ] . . . . (d) [t]he person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]"

5. Trial was originally scheduled to commence on June 25, 2007, but was continued. Trial began on November 9, 2007.

Santiago in the Kalihi area on Oahu and obtained a verbal statement from him, which the prosecution apparently believed rebutted Defendant's alibi. Santiago refused to give a written statement. The prosecution did not notify or disclose this information to Defendant.

According to Defendant's trial counsel's later declaration in support of Defendant's motion for a new trial, on August 24, 2007, the prosecution informed the court and opposing counsel that it could not confirm the alibi and that the prosecution would be proceeding to trial. Then, "[a]t a scheduling conference prior to trial," on November 6, 2007, Defendant informed all parties that he would only call Benavides because Defendant could no longer locate Santiago.

However, at the November 15, 2007 posttrial conference to settle jury instructions, the prosecution disclosed that within "two days" of being informed that Defendant could not locate Santiago, Santiago was discovered on the Big Island, and "was [thereafter] returned to Oahu to testify in [Respondent's] rebuttal case." The record does not reflect the exact dates when Respondent located Santiago on the Big Island (as opposed to July 18 in the Kalihi area on Oahu), but "two days" from the time Defendant told the prosecution that Santiago could not be located would have fallen on November 8, 2007.

### B.

#### 1.

On November 8, 2007, jury selection commenced. The case proceeded to trial the next day, November 9, 2007.

During its opening statement, the prosecution told the jury that the evidence would show that Defendant committed the charged offense, and that Defendant would be relying on an alibi defense:

Now we expect that the defense which is under no obligation to put on any defense at all but will present witnesses that will say that [Defendant and his associates] weren't [at the scene], so-called alibi witnesses, but those very witnesses are Jamison Benavides and perhaps Timothy Santiago which the State will show are simply not believable witnesses and have every reason to make up this story, to make up this alibi, [sic] will not be credible.

During his opening statement, Defendant told the jury that at the time of the incident, Defendant was "miles away in Pearl City ... with his own friends, doing his own thing, having his own fun."

#### 2.

At trial, CW testified that around 10:30 or 11:00 p.m. on November 6, 2006, he and two associates, Miller and Durham, went to club "Femme Nu" (Femme Nu) where they had four to five drinks. Approximately three hours later, CW and his friends went to Exotic Nights, located on Ward Avenue. CW testified that he was not "completely intoxicated" but had a "buzz." After spending fifteen minutes at Exotic Nights, the trio left and walked towards Ward Avenue, near Sports Authority, to hail a taxi.

As CW and his two friends were walking, they saw a "flat bed pickup truck with two gentlemen on the back" and one man in the front cabin. The truck stopped approximately twelve feet from CW, and three men exited the vehicle. When the men, whom CW described as "Polynesian, maybe Samoan," were about ten feet away, one of them deployed a metal baton. Miller and Durham ran away, but CW sat on the sidewalk "right in front" of the pickup truck and watched the men chase his friends.[6]

After chasing Miller and Durham for about five seconds, the three men returned to the truck and saw CW. The man holding the collapsible metal baton[7] approached CW and asked him if he was "looking for trouble." CW said he was looking for a taxi, and the man struck CW on the head with the baton saying, "Don't go looking for trouble." CW believed that he suffered a slight concussion.

---

6. CW's friends were Caucasian; CW, who was half white and half Asian, felt that he could avoid any confrontation.

7. CW testified that he was familiar with collapsible batons. He testified that a collapsible baton is six inches in length, can expand to 12 or 16 inches, and can have three or four sections.

The men then drove off and Durham and Miller called the police.

Officer Tanita testified that he responded to a call around 2:23 in the morning requesting assistance regarding an incident on Ward Avenue. When Officer Tanita arrived at the scene, CW said that a man had "hit" him. CW then gave Officer Tanita a description of the assailant.

There were some discrepancies between the description of the assailant noted by Officer Tanita and that offered by CW during trial. At trial, CW testified that he verbally told Officer Tanita that his assailant was a large Polynesian male, approximately five feet nine inches to five feet ten inches in height, weighing approximately 200 to 220 pounds, who had "tribal" tattoos "running down both sides of his arms and that he also had a chain." He denied telling Officer Tanita that the suspect had long hair. CW also testified that he told Officer Tanita that he believed the truck in which his attacker and the other men had ridden was a black Ford pickup truck.

Officer Tanita testified that, after hearing CW's version of events, he filled out a "252" statement[8] because CW was not "calm" enough to write it himself. Officer Tanita recalled that CW told him that the vehicle in which four (not three) male suspects rode was a black Ford "F150," and that the man who struck CW was a local "Polynesian," five feet nine inches tall, who was wearing a white shirt. Officer Tanita remembered that CW did not mention that the suspect had earrings, piercings on his face, floppy shoelaces, or a chain hanging from his clothing. Officer Tanita could not recall if CW told him that the suspect had tattoos. Officer Tanita indicated, however, that he may have been mistaken about the description because he "[u]sually ... ha[s] eight to a dozen" reports to fill out in a night. Officer Tanita stated CW appeared to be under the influence of alcohol, but seemed coherent.

At the scene, CW's friend Miller also provided a description of the assailant and completed a "252" statement. At trial, Miller admitted that in his 252 statement he indicated that the suspect had black hair and was wearing shorts. He did not say that the suspect had tattoos. He also stated, "[w]e may be able to identify but it would be difficult. I was not able to get the license plate number. My opinion is that it was ... [a] short bed pickup truck with a bedliner."

After giving a statement to the police, Miller caught a taxi with CW and Durham back to Waikiki. Miller then decided to go to club "Zanzabar" (Zanzabar). As he was walking toward Zanzabar, Miller noticed that the men "that were involved with the assault on [CW] were just standing there." Miller then walked over to a police officer and told the officer that the men had assaulted his friends. The officer then asked the two men "to come with [him]." A third suspect, later identified as Benavides, was apprehended by a second officer.

According to Miller, the officers then drove him to CW's hotel. At approximately 5:00 a.m., CW and Miller were separately brought to a three person field show-up[9] in Waikiki, consisting of Defendant, Benavides, and Santiago. CW identified Defendant as his attacker. After Defendant was arrested, an officer searched Defendant but did not find any weapons or batons.

Miller then completed another "252" form. At trial, he acknowledged that in his "252" form he did not indicate that the suspect had orange hair, big boots, jeans, a "hippy chain" or tattoos. Nonetheless, Miller testified that he "remember[ed]" "very clear[ly]" the man that hit CW, and described him as having "orange hair, a black shirt, a hippy chain, big boots, and jeans." According to Miller, the assailant was a "heavyset Polynesian," "probably 250 pounds[,]" that had "tattoos up and down on his arms[.]"

**3.**

Defendant and his friend Benavides also testified at trial to their version of the events.

---

8. According to Officer Tanita, a "252" statement is an "official statement form which the victim ... writes their [sic] statement of what happened [.]"

9. A showup is "a pretrial identification procedure in which a suspect is confronted with a witness or the victim of the crime." Black's Law Dictionary 1506 (9th ed. 2009).

According to Benavides, who was six feet and 290 pounds, on the night in question he drove himself, Defendant, Santiago and his friend Ryan Yamashita [ (Yamashita) ] in a Honda Civic to Club Electro." Benavides testified he did not own a truck.[10]

After leaving Club Electro at approximately 2:00 a.m., the men smoked cigarettes in the club's parking lot. Benavides then drove Defendant, Yamashita, and Santiago in his Honda Civic to the "Big Kahuna" nightclub (Big Kahuna) in Waikiki. He traveled down Kamehameha Highway, entered the H–1 freeway, and took the King Street exit to Kapahulu. He did not stop anywhere between Club Electro and Waikiki, and parked by the zoo. Upon leaving Big Kahuna, Yamashita left the group. The three remaining men were then stopped by the police and were told to sit down because they were being placed in a lineup.

Defendant's testimony was consistent with that of Benavides. Defendant, who was five feet nine inches tall and weighed 320 pounds, testified that on the night in question he was wearing a black shirt, cut off jeans, and combat boots with red laces that laced up to the bottom of his calf. His hair was almost white, or bleach blonde with streaks, and he had a goatee down to the bottom of his chin. He had seven earrings and two piercings on his lips. On the night in question, he had been carrying a chain wallet connecting his wallet to his belt loop. He also had tattoos, consisting of a "skull with a dagger, covered in spider webs[,]" "random old school style tattoos[,]" "a man engulfed in flames, and a woman."

Defendant testified that after spending some time in Waikiki, he was walking back to Benavides's vehicle when one of his friends pulled up with a tow truck. Defendant talked to his friend for a second, and when Defendant turned around, the police asked him to step away from the vehicle. Defen-

dant also testified that he had never been to Exotic Nights and did not know where it was located, was not in the area of Ward and Halekauwila on the night in issue, had never seen CW prior to seeing him in court, had never held a baton, and never struck CW.

II.

On November 14, 2007, during the testimony of the prosecution's last witness, the court recessed trial for fifteen minutes. According to the declaration of Defendant's trial counsel, at that point, "the court met in chambers with both parties[.]" The prosecution stated that it would object if Defendant was allowed to present his case on the following day because a " 'rebuttal' witness [the prosecution] had flown in" was scheduled to fly out that day. "It was only at this time the defense learned [the prosecution] had intended to call [ ] Santiago" to "rebut [Defendant's] alibi."

After the testimony of the last witness, the prosecution rested and the court released the jury for its lunch break. When the jury was no longer in the courtroom, Defendant orally moved for a judgment of acquittal, which the court denied. Defendant then asked that the prosecution make Santiago available for Defendant's counsel to speak to him. Counsel was concerned that, if Santiago's testimony was inconsistent with what he had previously related to counsel, counsel might have to become a witness to rebut Santiago's testimony and, as a consequence, counsel would have to move for a mistrial.[11] Defendant's counsel was permitted to speak to Santiago.

After talking to Santiago, Defendant objected to the prosecution calling Santiago to testify as a rebuttal witness, as a violation of HRPP Rule 12.1. Defendant maintained that the prosecution was required to give Defendant "written notice and [the] contact information of the names of people [the pros-

---

10. However, he owned a "tow truck" that has "the equipment for towing and whatnot in it." He owned, and ran, "Kinetic Towing."

11. During this exchange, it also appears that Defendant sought to compel the prosecution to turn over Santiago's statement under HRPP Rule 16(b)(1) (requiring the prosecution to disclose "the names and last known addresses of persons

whom the prosecutor intends to call as witnesses in the presentation of the evidence in chief, together with any relevant written or recorded statements"). The court denied the request to turn over the statement. Since other issues are dispositive in this case, we need not address HRPP Rule 16.

ecution] intend[ed] to call." Defendant also objected on the ground that Santiago was not a proper rebuttal witness because Defendant believed Santiago's testimony would reinforce Defendant's alibi. The prosecution replied that it did not have to disclose Santiago because Santiago had been disclosed to the prosecution by Defendant. Further, according to the prosecution, Santiago's statement to the prosecution rebutted Defendant's alibi. The court overruled Defendant's objection.

Defendant then renewed his objection:

[DEFENSE COUNSEL]: [The prosecution] is right, partially right, okay, insofar as we give our notice. They respond. We respond with specific names. *And then after their investigation, if they're going to have specific witnesses to rebut us, they need to give us written notice of that.* And the way [the prosecution] is trying to hedge around that rule is by saying he's a rebuttal witness. He doesn't have to give us notice. *Because it's specifically to rebut our alibi we're entitled to that notice.*

And furthermore, [the prosecution] knew we were looking for this guy. And [I] told the [c]ourt as much when [the prosecution] was present that I lost him. I can't find him. [The prosecution] . . . obviously knew where he was to the point where they had to make arrangements to fly him in.

[THE PROSECUTION]: We didn't know where he was. We thought along until last—when our status conference was, *I think last week sometime, whenever it was when you said you weren't calling [ ] Santiago is when I realized that you weren't calling [ ] Santiago. And I had to go look for him.* And that was based on defense's representation. They gave us an alibi witness name and then they don't call him.

[THE COURT]: *Overruled at this time.* (Emphases added.)

### III.

Over Defendant's objection, Santiago testified as a rebuttal witness. Santiago stated that on the night in question he went to Club Electro. He knew Defendant as a friend of Benavides. Santiago said he was "drunk" when he left the club, at which point he and Defendant entered Benavides's car. According to Santiago, there was no one else in the car. Santiago could not recall what kind of car it was.

Santiago testified that he "dozed" and "woke up chasing some guy[ ]"[12] on "Ala Moana Boulevard[,]" but could not recall why he was chasing the man, and could not remember the location of Benavides and Defendant. Santiago then returned to the vehicle, went back to sleep, and woke up in Waikiki. He did not know what happened from the time he left the club to the time he awoke in Waikiki. Santiago said he could not remember because he had "a lot" to drink.

Santiago recalled that an investigator subsequently asked him about the incident, but he could not recall telling the investigator what kind of vehicle Benavides was driving or what happened on the way to Waikiki. Santiago remembered that the investigator asked him questions, including whether Santiago would complete a statement on a piece of paper. Santiago refused because he "didn't really trust" the investigator and felt that the investigator was trying to put words in his mouth.

Santiago also said he did not want to fill out a form because he did not want his statement to be different from what he might have said to a "lady attorney[.]" Santiago was "not too sure" what he told the investigator. When pressed by the prosecutor, Santiago could not recall chasing a male or males toward Exotic Nights, did not remember being near Sports Authority, and did not remember telling the investigator that he was chasing males with Defendant.

During Santiago's testimony, the court asked counsel to approach the bench and told the prosecution that if Santiago could not remember what he told the investigator, the investigator's testimony regarding what San-

12. On redirect, Santiago was asked, "[D]o you remember chasing some guys[?]" He responded, "Yes."

tiago said was hearsay and would only be admitted in evidence to impeach Santiago. When Santiago finished testifying, the prosecution called its investigator as a witness. Before the investigator testified, the court gave the jury a limiting instruction, telling the jury that it could only consider the investigator's testimony to weigh Santiago's credibility.

The investigator testified that Santiago said he had been a passenger in a pickup truck that had stopped at the Sports Authority intersection. The investigator was asked, "Did [Santiago] indicate what he was doing specifically at that stop light?" The court again instructed the jury that the investigator's statements were "not allowed for the truth of what is being stated, but for credibility purposes of a prior witness." The investigator related that Santiago said that he was a "passenger in a pickup" and that "he doesn't know why, but [Defendant] and he started chasing two guys down the road away from Sports Authority towards Exotic Nights."

### IV.

The next day, while discussing jury instructions, Defendant's counsel asked that the limiting instruction regarding the investigator's testimony be included in the final jury instructions. The court denied the request, but cautioned the prosecutor that Santiago's statements to the investigator could not be used as "rebuttal evidence" during closing argument.

In closing argument, the prosecutor argued to the jury that Santiago had testified to a "half-truth" because he remembered "chasing two guys" with another person, and that Santiago's testimony placed him and Defendant "on Ward Avenue, near Sports Authority, chasing guys." The prosecution then told the jury, "That right there does in their alibi. That alone kills the defense." After deliberation, the jury found Defendant guilty as charged of the offense of Assault in the Second Degree.

### V.

On appeal to the ICA, Defendant argued in pertinent part that (1) the prosecution's last

minute disclosure of Santiago's alibi rebuttal testimony violated HRPP Rule 12.1 and Defendant's constitutional rights; and (2) the prosecution committed misconduct in closing argument by violating the court's instruction that Santiago's statements to the investigator could be considered by the jury for impeachment purposes only. The ICA rejected Defendant's points of error, affirmed the court's decision, and denied Defendant's request to reverse his conviction or remand for a new trial. *Valeros,* 2011 WL 1909109, at *1–2.

### VI.

In his Application, Defendant presents the following two questions:

(1) Whether the ICA gravely erred in affirming the. court's admission of Santiago's testimony as an alibi rebuttal witness.

(2) Whether the ICA gravely erred in concluding that the prosecutor did not violate the ... court's limiting instruction during closing argument.

Our resolution of the first question is dispositive, and thus we do not reach the second question posed by Defendant.

### VII.

### A.

As to his first question, Defendant asserts that the prosecution should have disclosed Santiago to the defense as an "additional witness" under HRPP Rule 12.1(b) and (d) when the prosecution learned that Santiago would provide evidence to rebut Defendant's alibi. Noting that HRPP Rule 12.1(e) nevertheless gave the court discretion to admit the testimony, Defendant argues that the "opportunity to conduct an on-the-spot interview in the middle of trial did not cure the undeniably prejudicial effect on the defense strategy when defense counsel had prepared for trial on the assumptions that (1) Santiago's prior statement to her confirmed the alibi, but despite her best efforts to locate him, she (2) had to proceed to trial without Santiago because she was unable to locate him."

According to Defendant, "a judicial finding that defense counsel's last-minute, during-

trial interview of a possibly recanting witness as an adequate remedy for the prosecution's nondisclosure is hugely problematic" because it "compels the lawyer to make herself a witness[.]" Finally, Defendant contends that the prosecution's "tactics" "violated Defendant's right to present his alibi defense, [his] due process right to a fair trial, and were not harmless beyond a reasonable doubt, where the alibi defense was Defendant's sole defense."

The prosecution counters that HRPP Rule 12.1(e) gives the court discretion to allow the testimony of the undisclosed witness. HRPP Rule 12.1(e) provides that "[u]pon the failure of either party to comply with the requirements of this rule, the court *may* exclude the testimony of any undisclosed witness...." (Emphasis added). According to the prosecution, "[a]s such it is clear ... that the circuit court is provided the discretion of allowing or disallowing the testimony of any undisclosed witness." The prosecution also argues that, assuming *arguendo* that Defendant is correct that the prosecution should have disclosed Santiago as a witness pursuant to HRPP Rule 12.1(b), the court did not abuse its discretion in allowing Santiago to testify because Defendant had interviewed Santiago prior to trial regarding the night in question; Defendant was allowed to interview Santiago before he testified; and Defendant failed to request a continuance based on the allowance of Santiago's testimony. (Citing *State v. Miller,* 67 Haw. 121, 680 P.2d 251 (1984)).

### B.

The ICA held that the "HRPP Rule 12.1(b) does not initially require disclosure unless a party intends to rely on a witness[;] and it does not appear from the record that [the prosecution] intended to rely on Santiago as a witness at the time of its initial disclosure." *Valeros,* 2011 WL 1909109, at *1. As to HRPP Rule 12.1(d), the ICA held that Rule 12.1(d) "only applies to an 'additional witness whose identity, if known should have been included in the information furnished' pursuant to the required disclosures under HRPP

Rule 12.1(b)." *Id.* Because Santiago had already been disclosed by the defense, the ICA concluded that "he was not an 'additional witness' within the meaning of [HRPP Rule 12.1(d) ]." *Id.* Finally, the ICA concluded that Rule 12.1(e) did not require the exclusion of the offending testimony. *Id.* According to the ICA, "[w]here Santiago was originally [Defendant's] own witness and the [ ] court gave [Defendant] an opportunity to re-interview Santiago prior to the latter's testimony at trial, it was not an abuse of discretion to allow Santiago's testimony." *Id.*

### VIII.

It is undisputed from the record that the prosecution did not disclose to Defendant that it would use Santiago as an "additional witness" to CW and Miller to counteract the alibi defense. Disclosure was to have been "promptly" made, HRPP Rule 12.1(d), when (1) the prosecution obtained Santiago's verbal statement to the investigator that Defendant was present at the scene of the crime; and (2) when it determined that it would call Santiago as its witness, which occurred, at the latest, when it located Santiago on the Big Island and arranged to fly Santiago from the Big Island to testify. At such points, Santiago, although previously listed on Defendant's list, became an "additional witness," HRPP Rule 12.1(d), for the prosecution, and Santiago "should have been included in the information furnished under [HRPP Rule 12.1,] section (b)[.]"

To reiterate, HRPP Rule 12.1(b) states that the prosecution "shall ... inform the defendant in writing of the names and addresses of the witnesses upon whom the government *intends to rely to establish defendant's presence at the scene of the alleged offense.*" (Emphasis added.) In *State v. Davis,* 63 Haw. 191, 194–95, 624 P.2d 376, 379 (1981), this court adopted the reasoning in *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), and held that HRPP Rule 12.1 provides for reciprocal discovery in conformance with due process and that discovery under HRPP Rule 12.1 is a "two-way street."[13] *Cf. State v. Dowsett,* 10

**13.** In *Wardius,* the United States Supreme Court reasoned that (1) the Due Process Clause speaks

Haw.App. 491, 498, 878 P.2d 739, 743 (1994) ("Discovery is at the very foundation of the fact finding process. Faithful adherence to discovery obligations serves the public interest: Discovery provides the basic information which is necessary to expedite trials and plea decisions in an already overburdened court system and promotes fairness in the adversary system.").

█ *Davis* held "that once defendant has furnished to the government the names and addresses of his alibi witnesses, defendant has a reciprocal right to discover the names and addresses of witnesses *the government intends to rely on to rebut or discredit defendant's alibi witness.*" 63 Haw. at 196, 624 P.2d at 380 (emphasis added). Consequently, when the prosecution realized it was going to rely on Santiago to place Defendant at the scene of the offense, disclosure was required even though Santiago was not listed as such a witness in the prosecution's initial notice of its witnesses under HRPP Rule 12.1(b). Under *Davis*, the prosecution was required to disclose that it would use Santiago to rebut or discredit Defendant's alibi even though Santiago had been listed as a witness by the defense. *See id.*

### A.

### 1.

A plain reading of HRPP Rules 12.1(b) and 12.1(d) indicates that the prosecution had a continuing duty to disclose Santiago as an "additional witness." *See Davis*, 63 Haw. at 194, 196, 624 P.2d at 378, 380 (noting that "the government is required to disclose the identity of the witnesses on whom it will rely to establish the defendant's presence at the scene of the offense and of any other witnesses who will be used to rebut the testimony of defendant's alibi witnesses[,]" and holding that once the "defendant has furnished to the government the names and addresses of

his alibi witnesses, [the] defendant has a reciprocal right to discover the names and addresses of witnesses the government intends to rely on to rebut or discredit defendant's alibi witnesses") (internal citation omitted).

The ICA interpreted the words "should have been included" in HRPP Rule 12.1(d) as limiting the duty to disclose a witness who was not disclosed "at the time of its initial disclosure[,]" under HRPP Rule 12.1(b), *Valeros*, 2011 WL 1909109, at *1, but whom the party knew at that time would place a defendant at the scene of the offense. However, this interpretation would defeat the purpose of HRPP Rule 12.1 inasmuch as it would preclude disclosure of witnesses who were discovered after initial disclosure, i.e., "learn[ed]" of "prior to or during trial," and would be inconsistent with the *"[c]ontinuing* duty to disclose," (emphasis added), imposed by HRPP Rule 12.1(d).

### 2.

The obligation to notify the defendant of "the existence and identity" of additional witnesses must be exercised "promptly," HRPP Rule 12.1(d). The prosecution first contacted Santiago on July 18, 2007. At the latest, by November 8, 2007, the prosecution knew that it would call Santiago as a witness, but it did not disclose his status as an alibi-rebuttal witness until November 14, just before the defense was to start its case, and after the prosecution had already flown Santiago from Hawaiʻi to Honolulu. *Cf. State v. Sherman*, 70 Haw. 334, 340, 770 P.2d 789, 793 (1989) (noting that "the prosecution is obliged, within a reasonable time, to make available the specifics required by [HRPP Rule 12.1(b) ]"); *see also Paul's Elec. Serv., Inc. v. Befitel*, 104 Hawaiʻi 412, 420, 91 P.3d 494, 502 (2004) (noting that this court has imported the reasonableness standard into HRPP Rule 12.1,

---

"to the balance of forces between the accused and his accuser" and thus "[i]t would be fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State," 412 U.S. at 476, 93 S.Ct. 2208; and (2) that because the

prosecution has greater financial and personnel resources with which to investigate and scientifically analyze evidence, in addition to a number of other tactical advantages, if there is to be any imbalance in discovery rights, it should work in the defendant's favor. *id.* at 476 n. 9, 93 S.Ct. 2208 n. 9.

even though the "time frame [i]s not specified" in that rule).

### 3.

HRPP Rule 12.1(b) does not state that a party is excused from disclosing a witness it intends to rely upon to rebut the defendant's alibi, except as set forth in HRPP Rule 12.1(f). According to the record, while Defendant had listed Santiago as an alibi witness, he had lost track of Santiago and was unaware that Santiago would instead be appearing as a rebuttal witness for the prosecution. Under these circumstances the prosecution concealed Santiago's new status as *its* alibi-rebuttal witness. *See Sherman,* 70 Haw. at 341, 770 P.2d at 793 (noting that the "purpose of the rule was to provide *reciprocal* discovery between the prosecution and the defense," (emphasis in original), and that "[t]he adversary system of trial is hardly an end in itself; it is not a poker game in which [the] players enjoy an absolute right always to conceal their cards until played") (internal quotation marks and citation omitted). Thus, the prosecution's failure to disclose Santiago as its rebuttal witness violated HRPP Rule 12.1. *Id.*

### 4.

■ The court had the option, under HRPP Rule 12.1(e), to exclude Santiago's testimony. The ICA reasoned that because the court gave Defendant an opportunity to re-interview Santiago before he testified at trial, the court did not abuse its discretion when it did not exclude Santiago. The prosecution adds that Defendant had interviewed Santiago before trial and could have asked for a continuance.

However, the fact that Santiago was interviewed by defense counsel before trial only magnified the prejudice to Defendant caused by the prosecution's failure to name Santiago as its witness. Defendant had listed Santiago as his own alibi witness but was unable to subsequently locate him and was thus caught by surprise upon learning that Santiago was going to be called by the prosecution instead.

The opportunity to interview Santiago during the middle of trial did not cure the prejudice to Defendant from the prosecution's failure to abide by HRPP Rule 12.1. HRPP Rule 12.1(d) imposes a continuing duty to promptly disclose witnesses. Its purpose is precisely to avoid such mid-trial surprises.

Additionally, had Defendant known before trial that the prosecution intended to call Santiago as a rebuttal witness, Defendant could have adjusted his trial strategy to avoid an alibi defense at all. Given the inconsistencies in the testimony of the prosecution's eyewitnesses, CW and Miller, Defendant might have chosen to focus solely on calling into question the reliability of their identification testimony. That avenue was no longer open to Defendant when the prosecution belatedly revealed that it was going to call Santiago. By then, as Defendant asserted in oral argument before this court, Defendant was already committed to an alibi defense; both parties had discussed the alibi defense during their opening statements, and Defendant had pursued the defense during trial. In fact, at the time of its opening statement, the prosecution apparently knew Defendant could not locate Santiago and knew that it had obtained a statement from Santiago on July 18. The opportunity to interview Santiago during the middle of trial therefore did not mitigate the prejudice to Defendant. For the same reason, a continuance would not have mitigated the prejudice to Defendant. Accordingly, we reject the prosecution's suggestion that Defendant was required to request a continuance in these circumstances.

### B.

Under HRPP Rule 12.1(f), "the court may grant an exception to any ... requirements of [the] rule[ ]" only "[f]or good cause shown[.]" The exception clause was not invoked by the prosecution and no showing of good cause was made at trial under HRPP Rule 12.1(f).

*Davis* is instructive in this regard. In *Davis,* the defendant failed to notify the prosecution and the circuit court that he intended to rely on an alibi defense before trial, as required under HRPP Rule 12.1(a). 63 Haw. at 197, 624 P.2d at 381. Instead, the

defendant notified the court and the parties that he would use an alibi defense only after the jury was selected. *Id.* The defendant testified at trial to such a defense and sought to have an alibi witness testify. *Id.* The circuit court disallowed the defendant's alibi witness from testifying and imposed a sanction on the defendant because he failed to comply with HRPP Rule 12.1. *Id.*

This court determined that the circuit court did not abuse its discretion under HRPP Rule 12.1(e) in excluding the alibi witness. According to Davis, the circuit court had "discretion, *upon a showing of good cause, to make exceptions to the rule so as to balance the interests of both the government and the defendant to give both an opportunity to discover on equal terms.*" 63 Haw. at 198, 624 P.2d at 380–81 (emphasis added). Because there was no "good cause" shown for the defendant's failure to comply with HRPP Rule 12.1, this court held the circuit court properly exercised its discretion in excluding the alibi witness from testifying. *Id.* at 197, 624 P.2d at 380–81.

## IX.

■ In the instant case, as explained *supra,* the prosecution failed to abide by HRPP Rule 12.1 inasmuch as it had interviewed Santiago on July 18, 2007, and then discovered "two days" after the pretrial conference of November 6, 2007 that Santiago was on Hawai'i, but only disclosed Santiago as a rebuttal witness on November 14, the day that Defendant was to present his case at trial. This disclosure of Santiago, when it appears that the prosecution had obtained a statement on July 18, 2007, and knew of Santiago's whereabouts before trial began and five days into the trial, was not made "promptly," HRPP Rule 12.1(d), and was a violation of HRPP Rules 12.1(b) and (d). The record does not reflect any "showing of good cause" or an inquiry by the court as to why the prosecution failed to disclose Santiago sooner as a basis for granting an exception to the requirements of HRPP Rule 12.1. *See* HRPP Rule 12.1(f).

■ Instead, the court overruled Defendant's objection [14] that Santiago should not be allowed to testify because of the late disclosure, without providing any reasons. Respectfully, inasmuch as the court did not determine that "good cause" existed for applying an exception to the prosecution's duty to adhere to HRPP Rule 12.1, the court's overruling of Defendant's objection was in error. *See Davis,* 63 Haw. at 195–97, 624 P.2d at 379–81 (determining that a court may "make exceptions to the rule" only "upon a showing of good cause"). What matters is not whether Defendant knew about the existence of Santiago, but whether Defendant knew that the prosecution was going to use Santiago as a rebuttal witness to the alibi defense. *See id.* To avoid unfairly surprising Defendant, it was necessary for the prosecution to comply with its obligation to notify Defendant that it intended to use Santiago as a rebuttal witness. *See id.* The prosecution did not do so. In this case, therefore, discovery was not a "two-way street," and the prosecution's failure to provide reciprocal discovery infringed upon Defendant's due process rights. *See id.* at 195, 624 P.2d at 379.

## X.

■ The remaining issue is whether the error was harmless. When assessing whether an error is harmless, the question is whether, in light of the entire proceedings, there is "a reasonable possibility that [the] error might have contributed to the conviction." *State v. Veikoso,* 126 Hawai'i 267, 274, 270 P.3d 997, 1004 (2011) (internal quotation marks and citation omitted). *State v. Ah Choy,* 70 Haw. 618, 780 P.2d 1097 (1989), is relevant in this regard. In *Ah Choy,* the defendant was convicted after a jury trial of attempted murder and robbery. *Id.* at 618–19, 780 P.2d at 1098–99. The defendant filed a motion for a new trial on, *inter alia,* the ground that the prosecution failed to list an alibi rebuttal witness pursuant to HRPP Rule 12.1. *Id.* at 620, 780 P.2d at 1099. The circuit court denied the motion. On appeal,

14. To reiterate, Defendant objected on two grounds: that the prosecution violated HRPP Rule 12.1, and that Santiago was not a proper rebuttal witness. However, Defendant does not argue the latter on appeal, and, as such, it is not addressed further.

in pertinent part, the defendant argued that the circuit court abused its discretion in allowing the prosecution's witness to rebut the defendant's alibi witness testimony since the prosecution failed to name its rebuttal witness before trial. *Id.* at 623–24, 780 P.2d at 1102–03. This court decided the error was harmless because the "direct testimony" of the prosecution's witnesses "overwhelmingly contradicted" the defendant's alibi witness.

> Though we are deeply troubled by the prosecutor's failure to abide by our rules of discovery, *State v. Davis,* 63 Haw. 191, 196–97, 624 P.2d 376, 380 (1981), we cannot ignore the direct testimony of the store cashier who positively identified Appellant as her attacker, nor the direct testimony of the off-duty hotel security guard who saw Appellant crossing from the hotel.... *This testimony identifying Appellant overwhelmingly contradicted Appellant's alibi witness.* Accordingly, we hold the trial court's admission of the rebuttal witness' harmless error.

*Id.* at 625, 780 P.2d at 1103.

Unlike *Ah Choy,* there was no "direct testimony" that "overwhelmingly contradicted" Defendant's alibi. As shown *supra,* although CW and Miller ultimately identified Defendant as CW's assailant, their descriptions to the police contained inconsistencies, and Benavides and Defendant testified Defendant was elsewhere. The vehicle identified by the police was not tied to Defendant, and although a wooden baton was located, it was not the instrument used in the incident.

The court's error allowed Santiago's testimony into evidence wherein he testified that he and Defendant were chasing an individual on Ala Moana Boulevard. Without Santiago's testimony, the investigator's testimony would not have been admissible, inasmuch as the investigator was called upon to impeach Santiago.[15] The investigator testified that Santiago said he and Defendant were on Ward Avenue chasing individuals, contradicting Defendant's alibi defense. It follows that the admission of Santiago's testimony had a pivotal role in the case and reasonably might have contributed to his conviction. As a result, the admission of Santiago's testimony was not harmless beyond a reasonable doubt, *see Veikoso,* 2011 WL 4037979, at *10, and thus, the ICA gravely erred when it held that HRPP Rule 12.1 was not violated.

## XI.

Accordingly, the court's February 5, 2008 judgment of conviction and sentence of Defendant and the ICA's June 3, 2011 judgment are vacated and the case is remanded for a new trial.

---

**15.** We do not reach the question of whether it was proper for the court to allow the investigator to testify to "impeach" Santiago.