292 P.3d 1260

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Christ V. NGO, Petitioner/Defendant–Appellant.

No. SCWC–11–0000049.

Supreme Court of Hawai'i.

Jan. 4, 2013.

Summer M.M. Kupau, for petitioner.

Brian R. Vincent, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, and McKENNA, JJ., and Circuit Judge PERKINS, assigned due to vacancy.

Opinion of the Court by ACOBA, J.

We hold that in the indictment against Petitioner/Defendant–Appellee Christ V. Ngo (Petitioner) charging him with the offense of Accidents Involving Death or Serious Bodily Injury, Hawaii Revised Statutes (HRS) § 291C–12 [1] (Supp.2007), Respondent/Plaintiff–Appellee State of Hawaiʻi (Re-

---

1. HRS § 291C–12 provides in relevant part as follows:

(a) The driver of any vehicle involved in an accident resulting in serious bodily injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident *until the driver has fulfilled the requirements of section 291C–14.* Every such stop shall be made without obstructing traffic more than is necessary.

(Emphasis added.)

spondent) failed to allege the requirements of HRS § 291C–14(a) and (b),[2] and under the circumstances of this case, Petitioner was prejudiced by this defect in the indictment. Consequently, this case must be dismissed without prejudice. We therefore vacate the April 5, 2012 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its March 21, 2012 Summary Disposition Order, affirming the November 30, 2010 Judgment of Conviction and Probation Sentence filed by the Circuit Court of the First Circuit (the court)[3] on August 5, 2010.

## I.

On July 30, 2009, Respondent charged Petitioner with violating HRS § 291C–12. The indictment alleged as follows:

> On or about the 15th day of July, 2009, to and including the 16th day of July, 2009, in the City and County of Honolulu, State of Hawai'i, [Petitioner], as the driver of a vehicle involved in an accident resulting in serious bodily injury to or death of Justin Lee [ (Lee) ], *did fail to immediately stop the vehicle at the scene of the accident or as close thereto as possible, and did fail to forthwith return to and in every event*

*remain at the scene of the accident and fulfill the requirements of Section 291C–14* of the Hawai'i Revised Statutes, thereby committing the offense of Accidents Involving Death or Serious Bodily Injury, in violation of Section 291C–12 of the [HRS].

(Emphasis added.)

### A.

At Petitioner's trial, the following witnesses testified on behalf of Respondent.

#### 1.

Angella Smith (Smith) testified that, at the time of the incident, Lee was her boyfriend. On the evening of July 15, 2009, Smith planned to meet Lee for "karaoke."[4] Lee and Smith met approximately ten friends at a McDonald's restaurant located in Kahala, Honolulu (McDonald's). After about ten to fifteen minutes, the group decided to go to Zippy's Restaurant (Zippy's), also located in Kahala. It was Smith's understanding that there was going to be a fight there.

Lee parked his car across from Zippy's. As they exited the car, Lee and Smith "heard a big bang" "like a firecracker" from the

2. HRS § 291C–14 provides in relevant part as follows:

> (a) The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle or other property which is driven or attended by any person shall give the driver's name, address, and the registration number of the vehicle the driver is driving, and shall upon request and if available exhibit the driver's license or permit to drive to any person injured in the accident or to the driver or occupant of or person attending any vehicle or other property damaged in the accident and shall give such information and upon request exhibit such license or permit to any police officer at the scene of the accident or who is investigating the accident and shall render to any person injured in the accident reasonable assistance, including the carrying, or the making of arrangements for the carrying, of the person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that such treatment is necessary, or if such carrying is requested by the injured person; provided that if the vehicle involved in the accident is a bicycle, the driver of the bicycle need not exhibit a license or permit to drive.
> (b) In the event that none of the persons specified is in condition to receive the information

> to which they otherwise would be entitled under subsection (a), and no police officer is present, the driver of any vehicle involved in the accident *after fulfilling all other requirements of section 291C–12, 291C–12.5, or 291C–12.6, and subsection (a) of this section, insofar as possible on the driver's part to be performed, shall forthwith report the accident to the nearest police officer and submit thereto the information specified in subsection (a).*
> (Emphasis added.)
> HRS § 291C–12.5 is essentially the same as HRS § 291C–12 except that it governs the conduct of a "driver ... involved in an accident resulting in substantial bodily injury to any person" as opposed to an accident resulting in "serious bodily injury to or death of any person[,]" HRS § 291C–12. HRS § 291C–12.6 governs the conduct of a "driver ... involved in an accident resulting in bodily injury to any person."

3. On December 1, 2008, this case was committed from the district court of the first circuit to the court. The Honorable Michael A. Town presided over the trial.

4. " 'Karaoke' is a device that plays instrumental accompaniments for a selection of songs to which the user sings along[.]" *Merriam Webster's Collegiate Dictionary* 638 (10th ed.1993).

lower level parking lot of Zippy's. She and Lee ran into the parking structure and observed some people fighting and some people "busting windows."

Smith saw Lee run across the parking lot. A white Honda vehicle backed up and at the same time a gold-colored Sports Utility Vehicle (SUV) drove forward and struck Lee's legs and Lee fell to the ground. The Honda left, and the SUV started "going forward" and ran Lee over.

Smith approached the passenger side of the SUV, pounded on the windows and screamed, "My boyfriend's under your car; My boyfriend's under your fucking car; It's under your car" approximately six to ten times. She jumped in front of the SUV and pounded on the hood with both hands. Smith stepped aside and the SUV drove forward. Lee was dislodged from under the SUV after the vehicle went over a speed bump. The SUV then drove away.

### 2.

Lee testified that he and Smith were driving to the karaoke place when his friend, Andrew, called and told Lee he might be getting into a fight and needed Lee's help. Andrew told Lee to meet him at McDonald's. When Lee and Smith arrived at McDonald's, there were approximately ten to fifteen people there. Andrew told Lee "that he had some trouble with some people and that they were going to fight at the Zippy's [parking lot]."

Lee parked his car near a gas station close to Zippy's. The people he was with at McDonald's were already running into the lower level parking structure of Zippy's. Lee heard something that "[s]ounded like some kind of firecracker" just before he entered the structure.

When Lee first entered, people were running around; some of them were throwing punches, others were running away. He recognized his friends but did not recognize the others there. Although Lee was not armed, Lee believed he may have seen one or two of his friends carrying weapons.[5]

Lee was running through the parked cars when he heard tires screeching. At that time he was between two parked cars. He looked to his right and saw an SUV coming toward him. He believed the silver parked car "reversed or something" because he "got smashed between the silver car and the SUV[.]"

The SUV struck his lower right leg. He fell face down and the front two wheels of the SUV ran over him. While under the vehicle, he heard people yelling. Smith was yelling "My boyfriend's underneath the car."

The SUV dragged Lee's body across the parking lot and he was finally dislodged when the vehicle went over a speed bump. He saw the SUV leave the parking lot as his friends began to surround him. Lee was treated for his injuries and was in the hospital for nearly two months.

### B.

The following witnesses testified for the defense.

### 1.

Petitioner's friend, Shinichi Wood (Wood), testified that a conflict had developed between Petitioner's friends and Lee's friends. On the night of July 15, 2009, Wood and Petitioner were eating at Zippy's with some friends. After they finished, they went downstairs to the parking lot. Suddenly, several cars pulled up across the street. Wood heard what he believed were gunshots. Wood and his friends were afraid and decided to leave before anyone was hurt.

Wood and two other friends, Justin Perreira (Perreira) and Lane Morishima (Morishima) jumped into Petitioner's vehicle. At that moment, a group approached Petitioner's vehicle with metal batons and started "smashing the windows." The group shattered the passenger window and attempted to hit Wood with the baton. There were at least "five guys" on Wood's side (the passenger side) of the vehicle.

They were eventually able to leave Zippy's and drove to a "Shell" gas station (Shell)

---

5. Lee did not describe the weapons these individuals were carrying.

located in Kapahulu. Wood was unaware that the vehicle had struck anyone. Nothing about Petitioner's mannerisms or demeanor suggested that Petitioner knew he had struck anyone. While at Shell, Wood received several phone calls from individuals stating that someone may have been run over by a "Murano" vehicle. Wood did not identify specifically who the calls were from, stating, "People would just, like, call randomly[.]" At the time, he believed the Murano referred to was Petitioner's Murano.

However, Wood did not believe that anyone had been run over. It was not until he woke up the morning after this happened that several individuals told him the incident was on the newscast.

### 2.

Alex Heneralau (Heneralau) testified that on the evening of July 15, 2009, he was standing in the lower level parking structure of Zippy's when several cars pulled up and parked across the street. A "bunch of people" got out and ran toward them. Someone "fired something"; Heneralau "thought it was gunshots." Something flew toward his car[6] and left an indentation on his door. Heneralau and his girlfriend jumped into his car and people began striking his windows and broke the passenger window.

Heneralau said, "Let's get out of here." As he was attempting to reverse, his car hit the front of Petitioner's car. Heneralau exited the parking structure. After communicating with other friends over the phone, they decided to meet at Shell. Heneralau went home after he left Shell.

### 3.

Perreira testified that he was with Petitioner and their friends at Zippy's because a conflict had arisen between their group and Lee's group. Perreira, Petitioner, and their friends were standing in the parking lot and observed "the other group" pacing back and forth at a gas station across the street. The other group started running toward them.

Perreira "stood [his] ground" and "stayed there," but the "other guys [ ] in [his] group" "were kind of, like, Oh, let's get out of here"; "They're coming, they're coming[.]" One "or two guys" were carrying bats.

Someone pulled out a firearm and shot it toward the roof of the parking structure; the individual was "running and then waive[d] the gun up in the air," and yelled "chee-hoo." Perreira could not recall who was carrying the firearm. He was not sure whether it was flare gun or a "real" gun. When Perreira heard the first shot, he panicked and everyone "ran for [their] lives." Perreira "looked for the first car he could get into[,]" which was Petitioner's Murano. The window on the driver's side door was open so Perreira jumped through the window and crawled into the back seat.

Perreira heard two or three more shots. Petitioner believed one of the bullets had gone through Heneralau's window because he saw "a stream" through the window and he did not believe a "bat could make a stream like that. It was a straight piercing."

Wood and Morishima were also in Petitioner's vehicle. Perreira heard "cars getting banged" and "windows cracking." Perreira crouched down "with [his] hands behind his head" to avoid the glass from hitting his face. As he was "tucked" down, he heard a girl screaming, "My boyfriend, my boyfriend." Perreira believed the girl's boyfriend was being hit by a bat. He was not aware that anyone was struck by Petitioner's vehicle.

He remembered at some point they "were stuck" and the "car just kept getting whacked by a bat" so Perreira yelled at Petitioner, "We need to get the fuck out of here[,]" "do something, move." He "peeked to look up" and saw "a male trying to get inside the car, so [Perreira] assumed that was the guy that was getting hit by a bat[.]" The "car wasn't moving[.]" Perreira thought that a speed bump was preventing them from moving, and that Petitioner "floored it" and

---

**6.** As set forth *supra,* Lee testified that a white Honda backed up just before he was struck by Petitioner. Heneralau apparently drove a gray Scion vehicle. It is unclear whether Lee had testified incorrectly regarding the model of Heneralau's car or if he was referring to another car backing up, not belonging to Heneralau.

"got over" it. Perriera then called their other friends who told them to meet at Shell.

After they left the structure, they pulled over. There was glass "everywhere" but no one was injured seriously. When they arrived at Shell, the brother of Heneralau's girlfriend, Chris Khamlong (Khamlong), was there. Khamlong was on the phone attempting to determine who had a firearm. He heard Khamlong mention something about someone being "run over [by] the Murano" but everyone at Shell "thought it was all BS." Perreira and Petitioner left Shell and went to the home of their friend, Lance Fung Chen Pen (Lance).

Sometime the next morning Perreira learned from a newscast that someone had in fact been struck by a vehicle. By then, "[i]t was too late for [them] to call the police because [Petitioner's] auntie already called the police[.]"

4.

Petitioner testified that during the late evening of July 15, 2009, he and his friends were "talking stories" in the lower level parking structure of Zippy's when Heneralau said, "Oh, they're here." Petitioner looked across the street and saw the silhouette of several people jumping up and down and yelling. Petitioner began backing up toward his car in case something happened. The "guys started running" toward them saying, "Oh, where you think you guys going" in a threatening manner. He then heard a loud "bang[,]" which sounded like a gunshot.

Petitioner's "brain just told [him] to get out of there"; "Everything went red" and Petitioner "was panicking." Petitioner unlocked his car, a Murano SUV, and jumped into the driver's seat. Wood, Perreira, and Morishima also jumped into his car. Petitioner backed out of the stall and started to go forward. Petitioner's front bumper hit Heneralau's rear bumper as Heneralau was reversing. A group of people began hitting his vehicle with instruments, shattering both windows on the passenger side. Petitioner "duck[ed] down" and attempted "to drive forward at the same time."

Petitioner was pressing on the gas pedal but his car was not moving. Petitioner believed that his wheel had been damaged when he collided with Heneralau's car, or that someone had thrown something under his vehicle. Petitioner did not see his vehicle make contact with any person and did not know Lee was under his vehicle. When they eventually exited the parking structure, Perreira told Petitioner to go to Shell. At Shell Petitioner heard that someone may have been run over but Petitioner did not believe this because he "didn't see this [himself]" and "it was coming from the other side."

After a short while, Petitioner left Shell and proceeded to Lance's home. The next morning, on July 16, 2009, Lance returned from his paper route and told Petitioner to watch the newscast. "The news was talking about an attempted murder, a body being dragged, and [it] showed a picture of Zippy's." Petitioner started thinking about his car not being able to move and "connected the dots, slowly[.]" Petitioner called his aunts and asked them to accompany him in turning himself in to the police.

5.

Lance testified that a group ran toward them with bats and batons. He heard a gunshot as he was entering his car. Heneralau was the first to exit the parking structure in his vehicle. Lance followed after Heneralau. One of his passengers, Kari Traylor (Traylor) mentioned that Petitioner "was trapped in the back." Traylor said, "[Petitioner] is stuck," but Lance kept driving because there were a lot of people surrounding Petitioner's vehicle who had broken Petitioner's windows.

After exiting Zippy's, Lance drove straight to Shell. Lance did not know anyone was struck by a vehicle. "People [were] telling [them] that somebody was run over" but he did not believe them "at all." After they left, Petitioner stayed at Lance's home because Petitioner "didn't want to bring trouble to his family." The next morning, Lance returned home after doing his paper route and received a call from a friend, who told him to watch the news. The newscast indicated that someone had been dragged by a car at Zippy's the previous night.

Lance told Petitioner to watch the news. Petitioner was afraid and called his aunts to meet him at Lance's home. The police arrived shortly thereafter.

On cross-examination, Respondent asked whether Petitioner, Heneralau, and Perreira were also at Shell, and Lance indicated that they were. Lance also remembered Khamlong being at Shell. Lance was asked how much time had passed from the time he left Zippy's to the time he arrived at Shell. Lance responded, "Twenty to twenty-five minutes." He remained at Shell for approximately ten to fifteen minutes before leaving. Petitioner stayed at his home that night.

### C.

On redirect examination of Lance, defense counsel[7] asked questions pertaining to the order in which Petitioner, Heneralau, and Lance proceeded out of the parking structure. Immediately following redirect examination, the court asked Lance the following questions:

Q. Okay. At what point did you think maybe that somebody had been run over?

A. When we got to the Shell gas station.

Q. When you got to the Shell—Kapahulu Shell?

A. Yes.

Q. And what made you think that?

A. [Khamlong] was just—

Q. Nice and loud. You're mumbling.

A. [Khamlong] was all mad. And then they had, like, all this [sic] calls coming in.

Q. *[Khamlong] was mad?*

A. Yeah.

Q. *What was he mad about?*

A. He was talking about somebody getting runned [sic] over.

Q. *[Khamlong] was?*

A. Yes.

Q. *This is, like, a few minutes after you left the Zippy's?*

A. Yes. It was at the gas station.

. . . .

Q. So this whole scene came down at Zippy's Kahala; right?

A. Yes.

Q. And then you all left; right?

A. Yes.

Q. *And you went to the Shell Kapahulu?*

A. Yes.

Q. *And that's when you first thought in your head maybe somebody got run over?*

A. Yes.

Q. *And you thought that because [of Khamlong?]*

. . . .

A. Yes.

Q. *Okay. And that was discussed in front of all of you?*

A. Yes.

Q. *Discussed in front of [Petitioner]?*

A. Yes.

Q. Okay. And who did you think—which car do you think had run the person over?

A. We didn't know at the time.

Q. You knew somebody might have been run over?

A. No.

Q. Huh?

A. No, not really.

Q. But—why did—

A. Because they were, like, frustrating him over the phone. And then, like, all I remember was [ ] Khamlong was, like, willing to, like, try and hit [Petitioner], or he was going to. He was, like, super mad.

Q. *[ ] Khamlong was trying to hit [Petitioner]?*

A. No, not trying. He was pretty much ready to.

Q. *And the reason why?*

A. Because he's friends with Justin.

Q. *With which Justin?*

A. Justin Lee.

Q. *Justin Lee. [ ] Khamlong was friends with [ ] Lee?*

A. Yes.

7. At trial, Petitioner was represented by private counsel. On appeal, he is represented by the Office of the Public Defender.

Q. *He's upset because somebody ran over [ ] Lee?*

A. Yes.

Q. *Is that right?*

A. Yes.

Q. *And he wanted to hit [Petitioner]? Or he was—he was making big body or just talking or what?*

A. He was just talking.

Q. *He was talking. Okay. What did [Petitioner] say, if anything?*

A. He was, like, I didn't—he just didn't know the whole time.

Q. *He what?*

A. He didn't know the whole time.

Q. *Didn't know the whole time?*

A. Yes.

Q. Okay. And then later on it turned out somebody had been run over?

A. Yes.

Q. And dragged, right?

A. Yes.

Q. Did you know [ ] Lee?

A. No.

Q. Have you seen him since then?

A. No.

Q. All right. And how did [ ] Khamlong find this out? Over the cell phone—

A. Yes.

Q. —or he saw it?

A. Over the cell phone.

Q. Okay. Were people texting or calling?

A. Calling.

Q. They were calling?

A. Yes.

(Emphases added.)

On further redirect, defense counsel asked Lance the following questions:

Q. *Lance, did you believe somebody had been run over when you were at the Shell?*

A. No, not at all.

Q. Why didn't you believe somebody had been run over?

A. Because I don't recall anything happening.

Q. *And, I mean, after—even after [ ] Khamlong was saying this, did you believe* that, oh, you know, for sure somebody had been run over?

A. No.

Q. Okay. Why not?

A. I don't know. I just couldn't believe it.

Q. Okay.

A. There was, like, no proof. And I really can't see anybody getting runned [sic] over.

Q. Okay. And did [Petitioner] say anything about, Oh, I ran over somebody?

A. No, not at all.

Q. Okay. So when did you believe somebody actually had been run over?

A. The Zippy's—the news.

Q. The news.

The news the next morning—or that early morning after you came back from your paper route?

A. Yes.

Q. And what you knew in the news, what you learned from the news, you believed what the news depicted, right—

A. Yes.

(Emphases added.)

On recross-examination, Respondent asked, "to follow up with what [the court] asked you," did "Khamlong specifically used [sic] the name 'Justin Lee' at the Kapahulu Shell station?" Lance responded, "He just said 'Justin.'" Respondent then asked, did he say "that Justin had been run over?" Lance answered, "Yes."

### D.

At the end of trial, the court found Petitioner guilty as charged. The court stated, Petitioner "knew and was quite aware of what he did. He struck [ ] Lee at the Kahala Zippy's" and Lee was under Petitioner's car and dragged some way before he was dislodged. The court found that Petitioner "did not report this for some time after he was able to do so without harm to himself or to his car." The court concluded the "time lapse ... [was] both illegal and criminal in nature." The court said that, although Petitioner may "well now sincerely believe that

he didn't see or know [ ] Lee was struck by his Murano[,]," the "facts show otherwise beyond a reasonable doubt that he is guilty." According to the court, "[o]nce Petitioner reached Kapahulu Shell—if not before, he should have—should have and did not call 911 and follow what the statute required. He did not return home that night" and instead "stayed with a friend." The court concluded by stating, although his family "did the right thing albeit a little too late and a little—and too little, [Petitioner] respectfully is found guilty."

## II.

Petitioner appealed to the ICA. Pertinent to Petitioner's application for writ of certiorari (Application), Petitioner argued in his Opening Brief that the court committed plain error and violated Petitioner's constitutional right to a fair and impartial tribunal by questioning Lance extensively and eliciting evidence upon which the court specifically based its finding of guilt. The ICA determined that the court's questioning of Lance did not constitute plain error. *State v. Ngo*, No. CAAP-11-0000049, 126 Hawai'i 474, 2012 WL 954867, at *1 (App. Mar. 21, 2012) (SDO).[8]

## III.

Petitioner presents the following questions [9] in his Application: (1) "[w]hether the ICA's order affirming Petitioner's conviction constitutes an obvious inconsistency with the Supreme Court's April 12, 2012 decision in *State v. Nesmith,* [127 Hawai'i 48, 276 P.3d 617 (2012) ]," and (2) "[w]hether the ICA gravely erred in concluding that [the court] did not abuse its discretion when it engaged in prosecutorial questioning of defense witness [Lance]." On June 15, 2012, Respon-

dent filed a Response to Petitioner's Application (Response). Petitioner filed a Reply to the Response on June 22, 2012 (Reply).

## IV.

▆▆ In connection with the first question, Petitioner contends that the indictment was fatally defective because it did not allege (1) the "intentional, knowing, and reckless states of mind required for the HRS § 291C–12 offense" or (2) the requirements of HRS § 291C–14(a) and (b), which Petitioner was supposed to have violated in conjunction with HRS § 291C–12. Petitioner acknowledges that because he challenges the indictment for the first time on appeal, it " 'must be liberally construed.' " (Quoting *State v. Motta,* 66 Haw. 89, 90, 657 P.2d 1019, 1019 (1983).) Under the liberal construction standard, a conviction will not be reversed on account of a defective indictment " 'unless the defendant can show prejudice or that the indictment cannot within reason be construed to charge a crime.' " (Quoting *Motta,* 66 Haw. at 91, 657 P.2d at 1020.)

## V.

Petitioner first contends that the indictment cannot be construed to charge a crime because nothing in the indictment can be read as alleging that the requisite states of mind for the offense were intentional, knowing, or reckless. Additionally, Petitioner urges that because the states of mind were not alleged in the indictment, he did not have fair notice of the requisite states of mind and therefore was prejudiced by the defect in that regard. In view of our resolution of Petitioner's other arguments, and Respondent's acknowledgment during oral argument of its obligation to set forth the applicable

---

8. The second point of error raised by Petitioner on appeal to the ICA was that the court incorrectly convicted Petitioner because there was insufficient evidence that Petitioner failed to forthwith report the accident to a police officer when Petitioner turned himself in twelve hours after the accident. The ICA declined to define "forthwith" to mean "within a reasonable time under the circumstances" as opposed to "instantaneous action." *Ngo,* 2012 WL 954867, at *3. The ICA concluded there was substantial evidence to sup-

port the conclusion that by the time Petitioner reached Shell, he knew he had run someone over and failed to report that accident within the time frame required by HRS § 291C–12 and 291C–14. *Id.* Petitioner does not challenge the ICA's conclusion with respect to this issue in his Application and therefore it is not addressed further.

9. The order in which Petitioner presented his questions is reversed for analytical purposes.

states of mind in the charge, this point is not discussed further.

## VI.

■ In connection with the first question, Petitioner also contends that the charge was deficient because it omitted any allegation of the requirements of HRS § 291C–14, that are "essential elements" of HRS § 291–12. As indicated, because Petitioner challenges the sufficiency of the indictment for the first time in his Application, the liberal construction standard applies. *See Motta,* 66 Haw. at 91, 657 P.2d at 1020. Under this standard, this court " 'will not reverse a conviction based upon a defective [oral charge] unless the defendant can show prejudice or that the [oral charge] cannot within reason be construed to charge a crime.' " *Id.*

## A.

■ It must be observed at the outset that Respondent appears to have prosecuted this case on the basis that Petitioner had failed to comply with HRS § 291C–12, and that the requirements of HRS § 291C–14 were elements of HRS § 291C–12. The indictment itself alleges that Petitioner "did fail to immediately stop the vehicle at the scene of the accident or as close thereto as possible, and did fail to forthwith return to and in every event remain at the scene of the accident *and fulfill the requirements of Section 291C–14[.]* " (Emphasis added.) Also, as Petitioner asserts in his Reply, Respondent stated during closing arguments that "Element No. 5" of the charged offense was that Petitioner failed to "comply[ ] with the requirements of the law" which are "set forth under 291C–14." In closing argument, Respondent asked, "What are the requirements of the law?" Respondent stated, "They are set forth under [HRS § ] 291C–14[.]" Respondent proceeded to recite the requirements under both HRS § 291C–14(a) and (b):

> In summary fashion the requirements of the law require that a driver involved in an accident where a—where death or serious bodily injury has resulted *shall give the driver's name, address, and registration number of the vehicle to any person injured in the accident and, upon request,*

*the driver shall exhibit his driver's license to the person who is injured.* Furthermore, the law requires that *the driver shall render reasonable assistance to any person injured in the accident.* Now, that comes straight from the statute. Now, *that's 291C–14(a).*

291C–14(b) speaks to those situations where it is not possible for the driver to immediately do these things, specifically where the person—let me rephrase. Where the injured person is not in a condition to receive the information required under subsection (a) and no police officer is present, then the law requires this. *The driver shall forthwith report the accident to the nearest police officer.* "Forthwith" is a term with which this Court and attorneys are familiar. Perhaps not to the lay person. But "forthwith" means immediately, without haste, as soon as possible. "Shall" is a command. It is not a suggestion. It is not something open to interpretation. It is a language really of commanding or directing action. A person shall-let me rephrase. *The driver shall forthwith report the incident to the nearest police officer and thereupon disclose the required information as set forth in subsection (a). Those are the requirements of the law.*

(Emphases added.) Respondent then stated, "So as to Element No. 5, did the defendant . . . fulfill the requirements of the law in this case? The answer is a resounding no." Thus, Respondent took the position at trial that the requirements set forth in HRS § 291C–14 were elements of the HRS § 291C–12 offense, which Respondent was required to prove beyond a reasonable doubt at trial.

However, in its Response, Respondent takes a contrary position, arguing that, where it alleges a defendant failed to stop at all, Respondent need not prove that Petitioner failed to comply with HRS § 291C–14. Respondent suggests that whether a defendant complied with HRS § 291C–14 is relevant only when the defendant stops at or returns to the scene. But, Respondent is seemingly estopped from now advancing a theory of HRS § 291C–12 inconsistent with

its position at trial that Petitioner had violated HRS § 291C–12, partially on account of his failure to fulfill the requirements of HRS § 291C–14. *Roxas v. Marcos*, 89 Hawai‘i 91, 124, 969 P.2d 1209, 1242 (1998) (judicial estoppel "prevents parties from playing fast and loose with the court or blowing hot and cold during the course of litigation" (quotation marks and citation omitted)); *see also State v. Anger*, 105 Hawai‘i 423, 98 P.3d 630 (2004) (holding that the prosecution was judicially estopped from arguing that Rules of Evidence did not apply to hearings on the motion to suppress because the prosecution expressly proceeded below on the basis that hearing was subject to those rules).

### B.

In its Response Respondent also maintains that under the facts of this case, the requirements of HRS § 291C–14 were not essential elements of the HRS § 291C–12 offense. This position is also inconsistent with Respondent's position at trial. As pointed out by Petitioner in its Reply, Respondent stated in its closing arguments that the requirements of HRS § 291C–14 "constitut[ed] 'element no. 5' of the [HRS] § 291C–12 offense[,]" and that Respondent had the burden of proving "Petitioner did not fulfill" those requirements. Respondent is now estopped from arguing that the requirements of HRS § 291C–14 are not elements of the offense as well.

### C.

■ In any event, Respondent is incorrect that the requirements of HRS § 291C–14 are not essential elements of a HRS § 291–12 offense. As set forth previously, HRS § 291C–12 provides as follows:

(a) The driver of any vehicle involved in an accident resulting in serious bodily injury to or death of any person *shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of section 291C–14.* Every such stop shall be made without obstructing traffic more than is necessary.

(Emphasis added.) HRS § 291C–12 requires a driver involved in an accident resulting in serious bodily injury or death to either "immediately stop" at the scene of the accident or "stop as close" to the scene of the accident "as possible[,]" but then "forthwith return to and remain at the scene of the accident until the driver has fulfilled the requirements of [HRS] § 291C–14."

■ HRS § 291C–14(a) describes the information and aid a driver must provide when he or she is involved in an accident described by HRS § 291C–12.[10] Thus, under HRS § 291C–12, a driver may be criminally liable if he or she did not stop at or return to the scene of the accident and, consequently, did not provide the information and aid required to be provided under HRS § 291C–14(a). A driver may also be criminally liable under HRS § 291C–12 if the driver did stop at or return to the scene of the accident, but failed to remain at the scene until he or she provided all of the information and aid described in HRS § 291C–14(a).

On the other hand, HRS § 291C–14(b) appears to qualify a driver's duty to comply with HRS §§ 291C–12 and 291C–14(a) in certain instances described in HRS § 291C–

---

**10.** To reiterate, HRS § 291C–14(a) provides as follows:

(a) The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle or other property which is driven or attended by any person *shall give the driver's name, address, and the registration number of the vehicle the driver is driving, and shall upon request and if available exhibit the driver's license or permit to drive to any person injured in the accident or to the driver or occupant of or person attending any vehicle or other property damaged in the accident and shall give such information and upon request exhibit such license or permit to any police officer at the scene of the accident or who is investigating the accident and shall render to any person injured in the accident reasonable assistance, including the carrying, or the making of arrangements for the carrying, of the person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that such treatment is necessary,* or if such carrying is requested by the injured person; provided that if the vehicle involved in the accident is a bicycle, the driver of the bicycle need not exhibit a license or permit to drive. (Emphasis added.)

14(b). HRS § 291C–14(b) refers to circumstances in which persons involved in the accident are not in a condition to receive the information described under subsection (a), and no officer is present. In such an event, HRS § 291C–14(b) provides that after fulfilling the requirements of HRS § 291C–12 and HRS § 291C–14(a), among other statutes, "*insofar as possible on the driver's part to be performed,*" (emphasis added), the driver must "forthwith report the accident to the nearest police officer and provide the officer with the information set forth in [HRS § ] 291C–14(a)." [11]

HRS § 291C–12, read in conjunction with HRS § 291C–14(b), would require a driver to stop or return to the scene of the accident, and provide the required information and aid only "insofar as possible." In such circumstances, the driver must "forthwith report the accident to the nearest police officer and submit thereto the information specified in subsection (a)."

▇ HRS § 291C–12 does not speak in terms of requiring a driver to complete the requirements of HRS § 291C–14(a) only. The language of HRS § 291C–12 would allow compliance therewith by satisfying the requirements of either HRS § 291C–14(a) or (b). The prosecution would need to prove beyond a reasonable doubt that the defendant failed to fulfill the requirements under HRS § 291C–14 (a) or (b), which set forth specific conduct constituting the offense.[12] Plainly then, the requirements in 291C–14 (a) and (b) were essential elements that needed to be included in the charge.

Additionally, the mere reference to HRS § 291C–14 in the indictment was insufficient to allege the specific requirements set forth under HRS § 291C–14 (a) and (b) that Petitioner was alleged to have contravened. *State v. Elliott* is instructive. 77 Hawai'i 309, 884 P.2d 372 (1994). In *Elliott*, the defendant Elliott challenged, among other things, the charge of assault on a police officer. He was charged orally as follows:

> On or about the 28th day of June, 1991 in Kona, County and State of [Hawai'i] [defendant] intentionally, knowingly [or] recklessly caused bodily injury to *Officer Belinda Kahiwa* by biting her thereby committing the offense of assault in the third degree, assault of police office [sic] violation of Section 707–712.5[HRS] as [a]mended.

(Emphasis added.) 77 Hawai'i at 310, 884 P.2d at 373. Elliott argued that "the State failed to allege that the assault was against 'a police officer who was engaged in the performance of duty.'" *Id.* at 311, 884 P.2d at 374. This court held that, even under the liberal construction standard, "the statutory reference" was insufficient "to provide the necessary element missing from the charges so as to sufficiently state the offenses charged against Elliott." *Id.* (internal quotation marks, citation, and brackets omitted).

## VII.

### A.

▇ The defective charge must result in vacation of Petitioner's conviction if Petition-

**11.** As previously set forth, HRS § 291C–14(b) provides in its entirety as follows:

> (b) In the event that none of the persons specified is in condition to receive the information to which they otherwise would be entitled under subsection (a), and no police officer is present, the driver of any vehicle involved in the accident after fulfilling all other requirements of section 291C–12, 291C–12.5, or 291C–12.6, and subsection (a) of this section, *insofar as possible on the driver's part to be performed, shall forthwith report the accident to the nearest police officer and submit thereto the information specified in subsection (a).*
> (Emphasis added.)

**12.** Arguably, HRS § 291C–12 and HRS § 291C–14(b), appear somewhat contradictory. HRS

forthwith report the accident § 291C–12 requires a driver involved in an accident resulting in serious bodily injury to or death to either stop or return to the scene of the accident and remain there until he or she has provided all of the information and aid required by HRS § 291C–14(a). Under such a construction, only the requirements of HRS § 291C–14(a) would be possible of application with respect to the conduct prescribed in HRS § 291C–12. However, the duties of a driver under the circumstances set forth in HRS § 291C–14(b) qualify the obligations imposed under HRS § 291C–12 and HRS § 291C–14(a). The potential confusion created by the relationship between HRS § 291C–12 and the separate conditions in HRS § 291C–14(a) and (b) underscores the necessity for alleging HRS § 291C–14(b) was violated by Petitioner.

er can show that he was surprised, prejudiced, or hampered in his defense on account of the defective charge. *See Motta,* 66 Haw. at 90–91, 657 P.2d at 1019–20 (holding that under the liberal construction standard, even if the charge may be construed reasonably to charge an offense, the conviction must be vacated if the defendant establishes he or she was surprised, prejudiced, or hampered in his or her defense on account of the defective charge).

█ The record in this case establishes that Petitioner was prejudiced on account of the defective charge, insofar as the charge failed to allege whether HRS § 291C–14 (a) or (b) was charged. As discussed, under HRS §§ 291C–12 and 291C–14(b), if the "persons specified" are not in a condition to receive the information described in HRS § 291C–14(a) and no officer is present, the driver must comply with HRS §§ 291C–12 and 291C–14(a), but only "insofar as possible on the driver's part to be performed[.]" Subsequently, the driver must "forthwith report" the accident and furnish the information to the nearest police officer. HRS § 291–14(b).

In that context, Petitioner maintains the omission in the indictment of the subsections of HRS § 291C–14 "prejudiced [his] ability to defend ... because HRS § 291C–14 provides an alternative basis for criminal conduct" "more than what was actually charged in the indictment." According to Petitioner, he was "not aware of the conduct element" in HRS § 291C–14(b) for the offense of HRS § 291C–12. Therefore, he was unaware that he could be criminally liable under HRS § 291C–12 even in the event that he could not stop at or return to the scene of the accident, if he failed to "forthwith report" the accident to the nearest police officer. (Quoting HRS § 291C–14(b).) Petitioner maintains thus that he was not given notice of being charged with failing to comply with HRS § 291C–14(b) which would "negate[ ] his 'contemporaneous awareness' and choice-of-evils defenses."

## B.

As indicated, the indictment did not allege whether Petitioner was being charged with failing to comply with HRS § 291C–14(a) or HRS § 291C–14(b), or both.[13] In its opening statement, Respondent stated that after Petitioner struck Lee, the vehicle "never stopped and never returned. The driver in this case *never immediately stopped to give his name, address, or the registration number of his vehicle. He did not provide his driver's license or any other identification information.*" (Emphasis added.) Respondent maintained that,

> The evidence will further show that [Petitioner] did *not immediately stop after that collision.* He *did not provide the information required under the law,* namely his name, address, the registration number of his vehicle, nor did he provide any other identifying information.

> The evidence will show that he left Zippy's Kahala parking lot that late evening or early morning and *did not immediately return,* or in other words of the statute, *forthwith return to comply with the requirements of the law.*

(Emphases added.) Absent from Respondent's indictment and the opening statement was any reference to Petitioner having failed to "forthwith report the accident to the nearest police officer and submit thereto the information specified in [HRS § ] 291C–14(a)[,]" as required in HRS § 291C–14(b). Thus, it is apparent from Respondent's opening statement that Respondent was proceeding under the theory that Petitioner had violated HRS § 291C–12 and failed to comply with HRS § 291C–14(a).

At the close of the prosecution's case-in-chief, Petitioner moved for a judgment of acquittal. First, defense counsel argued that HRS § 291C–12 required Respondent "to prove that [Petitioner was] aware of the accident at the time it occurred." According to the defense, Respondent's case established reasonable doubt as to whether Petitioner

---

**13.** In light of the omission, Petitioner was uninformed as to the nature and cause of the accusation against him, as required by Haw. Const. Art. I, § 14. Article I, section 14 of the Hawai'i

Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation[.]"

knew at Zippy's that he had struck Lee. Defense counsel also argued that Respondent's evidence established his choice-of-evils defense.

The court then inquired, "So he had no obligation to go to a place of safety, safe haven, whatever it is, and call the police?" Apparently believing Petitioner had been charged with violating HRS § 291C–12 for failing to fulfill the requirements of HRS § 291C–14(a), as Respondent had suggested, defense counsel urged that the statute "did not envision the circumstances [in this case]." Further establishing Petitioner's understanding that Respondent had charged him with failing to comply with HRS § 291C–14(a), defense counsel argued, that "[t]he statute doesn't address" whether Petitioner should have contacted the police when he did in fact learn he had been involved in an accident, stating, "if upon learning that he was involved in an accident, should he have contacted the police? The statute doesn't address that. But morally we feel like it would be morally correct to do so."

In rebuttal, Respondent responded to Petitioner stating, "The requirements of the law are found in 291C–14" which recognizes that when "the person injured in the accident is not in condition to receive the information, the driver nonetheless had an affirmative duty to ... forthwith report the accident to the nearest police officer and submit thereto the information specified in the sub-section[,]" and "[t]hat did not happen in this case." However, Respondent had not alleged in the indictment the requirements under HRS § 291C–14(b) that Petitioner was said to have violated. Absent an allegation that Petitioner had failed to comply with HRS § 291C–14(b), Petitioner was not provided notice of the requirement that, although unable to stop at or return to the scene of the accident, he must "forthwith report" the accident to the nearest police officer under HRS § 291C–14 (b).

Seemingly, from the foregoing, up until Respondent's rebuttal of Petitioner's arguments for judgment of acquittal, Petitioner believed he had been charged with violating HRS § 291C–12 and HRS § 291C–14(a). Only after Petitioner argued that the charged offense did not cover situations in which a defendant fails to report the accident to the police did Respondent contend Petitioner could also be found criminally liable under HRS § 291C–14(b). Such notification does not cure the prejudice to Petitioner. *Cf. State v. Valeros,* 126 Hawai'i 370, 380, 271 P.3d 665, 675 (2012) (stating that the defense's "opportunity to interview" the prosecution's witness, an individual whom the defendant had intended to call as an alibi witness, "during the middle of trial" "did not cure the prejudice to Defendant"). In this regard Petitioner was hampered in his defense.

Subsequently, Petitioner seemingly attempted to shift the focus of his defense a bit. But, even during closing arguments, defense counsel argued that Petitioner had been charged with failing to return to the scene, indicating that it was the defense's belief the charge focused on HRS § 291C–12 and HRS § 291C–14(a):

> Under HRS § 291C–14, when someone is injured, it's pretty clear that *if you read the statute as being applicable* in this case, *you would have to find,* as [Respondent] has suggested, that *the person has to be* injured that individual or *right then and there.*

(Emphases added.) At that point, the court referred defense counsel to HRS § 291C–14 (b):

> What is the second portion here? I've been trying to cross-reference these. 291C–14 and 12 that says, [i]n the event none of the persons specified is in the condition to receive the information in which they otherwise would be entitled, and no police officer is present, the driver of any vehicle in the accident, insofar as possible on the driver's part to be performed, shall forthwith report the accident to the nearest police officer, etc.

The court stated that it understood Petitioner's position as interpreting HRS § 291C–12 to require a driver to report the accident "right there at the scene[.]" Defense counsel affirmed that that was Petitioner's position, "as [Respondent] suggest[ed]."

44

It would appear that because the subsection of HRS § 291C–14 with which Petitioner was being charged was not specified, Petitioner was not made aware that even if his failure to stop was defensible, the law imposed the additional requirement that he "forthwith report the accident[,]" pursuant to HRS § 291C–14(b). Because Respondent advanced the theory that Petitioner was charged with failing to comply with HRS § 291C–14(b) during the middle of trial, Petitioner was hampered in presenting his defense. In sum, Petitioner appears to have been prejudiced by the omission in the indictment of the requirements of HRS § 291C–14 he allegedly violated.

## VIII.

 In connection with the second question, Petitioner argues that (1) the court's examination of Lance was improper because (a) it "did not simply 'clarify' any areas in the prosecution's or the defense's line of questioning," and (b) the questioning exhibited bias in favor of the prosecution and against the defense; (2) although Petitioner did not object to the court's questioning, the error constituted plain error because it violated Petitioner's right to an impartial judge; and (3) assuming the court's questioning did not rise to the level of plain error, Petitioner was deprived of his constitutional right to effective assistance of counsel where defense counsel failed to object to the court's questioning. We discuss these issues in light of the probability of retrial in this case.

## A.

 This court has said that although a trial court may within its discretion ask questions of the witnesses, "the trial judge should not cross-examine a [witness] so extensively as to give rise to jury bias." *State v. Hutch*, 75 Haw. 307, 326, 861 P.2d 11, 21 (1993) (quotation marks and citation omitted). "When the court assumes the role of a prosecutor, it violates the fundamental due process requirement that the tribunal be impartial[.]"

*State v. Silva*, 78 Hawai'i 115, 121, 890 P.2d 702, 708 (App.1995). However, a trial "judge is accorded considerably greater discretion in the questioning of witnesses in jury waived trials" because "[i]n such cases, it is the judge who is the trier of fact" and "there is no possibility of jury bias[.]" *Hutch*, 75 Haw. at 326, 861 P.2d at 21 (quotation marks and citation omitted). Hence, in bench trials such as in this case, "the judge's duty to clarify testimony and fully develop the truth in the case becomes particularly heightened." *Id.* (quotation marks and citation omitted) (emphases added). In this case, the court's questioning of Lance seemingly "clarified" [14] and "developed" [15] the evidence.

First, as recounted, Petitioner contends the court's questioning did not merely clarify other testimony inasmuch as there was no testimony "regarding [ ] Khamlong's personal friendship with [Lee]." Petitioner testified on direct examination that Khamlong was at Shell when Petitioner arrived immediately after the incident at Zippy's. He explained that Khamlong and others were standing near his vehicle. Petitioner admitted that he "heard that maybe somebody had been run over?" Petitioner related, however, that he did not believe that he had struck anyone, in part, because "it was coming from the other side[.]" Petitioner's defense counsel then clarified, "[Khamlong] as being with the other side?" Petitioner answered, "Yes."

The court's questioning regarding whether Khamlong "was friends with Lee" clarified what Petitioner's testimony suggested, i.e., that Khamlong was affiliated with Lee or at least one of Lee's friends. Hence, there was testimony suggesting that Khamlong and Lee were friends. The court's questioning made "clear" and "free of confusion[,]" *Merriam Webster's Collegiate Dictionary* at 211, whether Petitioner had meant that he did not believe someone had been run over because Khamlong had said it, and Khamlong was a friend of Lee.

14. "Clarify" is defined, *inter alia*, as to make "clear" or "free of confusion"; "to make understandable." *Merriam Webster's Collegiate Dictionary* at 211.

15. "Develop" is defined, *inter alia*, as "to make clear ... in more detail." *Merriam Webster's Collegiate Dictionary* at 316.

Petitioner also contends that the court's inquiry of whether Petitioner first learned at Shell of someone being injured was not a clarification of any testimony. However, as recounted, at that point, Perreira had already testified that at Shell, Khamlong said something about "somebody being run over" by a Murano. Petitioner also stated that he heard that someone had been run over, and suggested that this statement had originated with Khamlong.

On direct examination, Petitioner's defense counsel asked Lance, "As far as—you know today somebody was run over; is that correct?" Lance was asked whether he knew "anyone was run over" "at that time[,]" Lance explained, "[P]eople [were] telling us that somebody was run over." Defense counsel then attempted to clarify, "When you say people telling you, that's over the telephone?" Lance explained, "No, no. It was one of the guys at Shell gas station."

The court's question, "At what point did you think maybe that somebody had been run over" made more understandable the "time" that Lance became aware of this, in light of defense counsel's inquiry of whether Lance knew anyone had been run over "at that time." Additionally, the court's question regarding whether it was Khamlong who "made [Lance] think that" clarified who Lance was referring to when Lance said he learned that someone had been run over by "one of the guys at Shell gas station[.]" Further, the court's question as to whether Khamlong had said this in front of Petitioner, revealed the details regarding "at [what] time" Lance learned of this information, as asked by defense counsel, i.e., whether it was said at Shell while Petitioner was still present. In sum, Petitioner is incorrect that the court's questioning of Lance did not clarify or develop other testimony.

Finally, Petitioner challenges the court's questions regarding, "Khamlong's anger toward Petitioner upon hearing that it was Petitioner's vehicle that ran over [Lee], and Khamlong's actions of wanting to hit Petitioner as a result." It does not seem that Khamlong's anger toward Petitioner was brought out in any of the other testimony. However, it does not appear the court ex-

pressly considered this testimony in adjudging Petitioner guilty.

**B.**

■ Petitioner also asserts the court's ruling indicates the court relied on Lance's testimony in rendering its decision in this case. As noted, the court concluded Petitioner was guilty of the charged offense because he "knew and was quite aware of what he did[.]" The court explained that although Petitioner might "now sincerely believe that he didn't see or know [ ] Lee was struck by his Murano[,]" the "facts show otherwise beyond a reasonable doubt that he is guilty." Thus the court held that, "[o]nce Petitioner reached [ ] Shell—if not before, he should have—should have and did not call 911 and follow what the statute required." The court noted that Petitioner "did not report this for some time after he was able to do so without harm to himself or to his car."

The court did not expressly reference Lance's testimony. It may be argued that the court found that Petitioner knew prior to reaching Shell that he struck Lee; otherwise the court could not have concluded Petitioner should report the accident to the police "[o]nce Petitioner reached [ ] Shell if not before." In any event, although it cannot be ascertained definitively whether the court considered Lance's testimony, the court would be acting within its discretion to do so inasmuch as the court's questioning of Lance only clarified and developed the testimony. Although Petitioner maintains the court exhibited bias in favor of Respondent and against Petitioner, it cannot be concluded on this record that the court was biased. Consequently, the court did not plainly err in questioning Lance. Because the court did not err in questioning Lance, private defense counsel cannot be said to have been ineffective for failing to object to the court's questioning.

**IX.**

In light of the foregoing, the April 5, 2012 judgment of the ICA, which affirmed the court's November 30, 2010 Judgment of Conviction and Probation Sentence, and the

court's aforesaid judgment are vacated and the case is remanded to the court for proceedings consistent with this opinion.