**Electronically Filed
Supreme Court
SCAP-16-0000830
17-DEC-2019
09:27 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Plaintiff-Appellee,

vs.

JOSEPH PITTS,
Defendant-Appellant.

SCAP-16-0000830

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-16-0000830; CR. NO. 09-1-0097)

DECEMBER 17, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY POLLACK, J.

The defendant in this case was convicted of attempted murder in the second degree in connection with the stabbing of his longtime friend. After trial, the defendant made several motions, including a motion for new trial contending that the jury during its deliberations conducted an improper examination of his clothing to search for evidence of blood, and as a result several jurors discovered "stains" that had not been introduced

as evidence during trial.  The circuit court denied the motions, and the defendant was subsequently sentenced to life imprisonment with the possibility of parole.  The defendant appealed to the Intermediate Court of Appeals and the case was transferred to this court upon request.

On review, we conclude that the jury's discovery of the stains constituted an outside influence that may have tainted the jury's impartiality.  Because we find that the jury's discovery was not harmless beyond a reasonable doubt, the judgment of conviction is vacated and the case is remanded to the circuit court for further proceedings.

## I.  BACKGROUND

### A. Arrest & Pretrial Motions

On December 22, 2008, longtime friends Jason Brown and Joseph Pitts were driving to the airport to pick up a mutual friend.  On the way to the airport, Brown and Pitts made a stop, during which time Brown was stabbed in the neck and arm.  Pitts was taken into custody by officers of the Honolulu Police Department later that night and released pending investigation.  Pitts was subsequently charged in the Circuit Court of the First Circuit (circuit court) with attempted murder in the second degree, in violation of Hawaiʻi Revised Statutes §§ 705-500 (1993), 707-701.5 (1993), and 706-656 (Supp. 2008).

Prior to trial, Pitts filed a motion to dismiss the indictment, contending that the State failed to present to the grand jury a prior statement made by Brown describing the assailant as "an older black man" whom he did not know "but could identify him if he saw a picture." Pitts argued that because he had known Brown for almost twenty years the statement was clearly exculpatory. The circuit court denied the motion, concluding that because another witness, James Igawa, identified Pitts during the grand jury proceeding, Brown's statement was not clearly exculpatory.[1] At the same hearing, the court granted Pitts' separate motion to preclude Igawa from testifying at trial to an identification of Pitts, ruling that Igawa's pretrial identification was the result of an impermissibly suggestive drive-by identification made while Pitts was handcuffed next to a police car. Igawa, however, was allowed to describe what he saw during the incident and testify to the statements he gave to police.

## B. Trial

During jury selection, a prospective juror, responding to a question from defense counsel, shared her thoughts about the composition of the jury pool:

---

[1] The Honorable Glenn J. Kim presided over all the circuit court proceedings referenced in this opinion.

> [PROSECTIVE JUROR:] [F]or a long time I've been very concerned about if a black man in America can have a fair trial because, you know, it's supposed to be a jury of your peers . . . . I guess it's just been interesting . . . it doesn't look to me like there's any black people in the entire pool, so that just kinda concerns me.
> But, on the other hand, you guys obviously are not going to be able to get an entire pool of black people, of black men who are in his age range who have the same experience. . . .

Defense counsel asked the prospective juror whether she had any biases, leading to the following:

> [PROSECTIVE JUROR:] I might say that I have a bias against the status quo, and that is just that, you know, people who are minorities have to fight harder to be in an equal position, so that would be a bias, yes.
>
> [DEFENSE COUNSEL:] Do you feel that you could be a strong juror in this case?
>
> . . . .
>
> [PROSECTIVE JUROR:] Yes, I think so. But also as a scientist, I'm open to debate and providing sides, multiple sides of the story and, you know, coming to a conclusion based on that, so I would be open to hearing what other people have to say. But I also have very strong convictions myself and I can hold onto those.

After this exchange, the State used a peremptory challenge to excuse the prospective juror. The defense did not make an objection.

Before the evidentiary portion of the trial commenced, Pitts made an oral motion to preclude admission of evidence that, during his release from custody, he allegedly accused Brown of raping or sleeping with his then girlfriend and demanded an apology. The State admitted in the hearing on the motion that there was no evidence that prior to the stabbing Pitts thought Brown had been sleeping with his girlfriend.

Without such evidence, the circuit court concluded, introduction of Pitts' alleged accusation and demand for an apology were not relevant to the crime and the "probative value was so thin" that it was "outweighed by the danger of unfair prejudice."  The court accordingly granted Pitts' motion.

The State called security officer Bernard Prescott who testified that during his shift at "Kaiser Moanalua Hospital" (Kaiser Hospital) on December 22, 2008, at approximately 11:00 p.m., he was approached by an African-American male wearing a black shirt and carrying a black jacket.  This individual, whom Prescott identified as Pitts, was later arrested by police. Prescott described Pitts' movements in and around the hospital lobby area and stated that he did not see any blood on his face and visible hand or that he had a weapon of any kind.

Keola Guadiz testified that he encountered Pitts outside of Kaiser Hospital on that evening at around 11:00 p.m. Guadiz stated that Pitts asked him for a ride, and he described Pitts' demeanor as nervous.  He testified that he saw no other "black men" in the area that night and that he did not see any blood on Pitts' face or hands.

James Igawa testified that on the night of the incident he was sitting in his car when a red car parked in front of him about two and a half car-lengths away.  About five minutes later, stated Igawa, he heard screaming and commotion

5

coming from the car and saw the passenger get out of the car on the passenger side and get back in. The passenger then appeared to be "throwing punches" at the driver, he recounted. Igawa testified that he observed two heads going back and forth, with the passenger lunging at the driver. According to Igawa, the passenger got out of the car, the driver started making noise, and the driver jumped out of the car backwards and ran down the street when the passenger reentered the car. Igawa testified that the passenger then got out of the car, looked back in the car and grabbed some items, and began walking slowly up the sidewalk in the opposite direction from the driver. Igawa stated that he then called 911.

Igawa described the passenger as a black male who was "tall . . . wearing black--dark black clothes; long, long black pants; looked like a long black sweater of some sort; kinky hair," and had a "kind of [a] swaggering" walk. Igawa testified that he did not see another "black man dressed in all black clothing" in the area. The State played an audio of Igawa's 911 call in which he described the possible suspect as wearing dark clothes "[l]ike long-sleeve black pants, long-sleeve black shirt."

Officer Antwan Stuart testified that on that date he arrived at Kaiser Hospital about 11:30 p.m. The officer testified that he found and detained an African-American male

that fit the description of the subject "to a T," whom he identified as Pitts.  Officer Stuart stated that the only blood he saw was on the sleeve of the jacket Pitts was carrying. Officer Stuart further testified that he did not see any blood on Pitts' face or hands and that Pitts did not appear injured. The officer identified the jacket Pitts was carrying and the clothes that he was wearing when he was arrested, and these items were admitted into evidence.

Evidence Specialist Autumn Sunaoka testified to taking pictures of the crime scene and the clothing recovered from Pitts, swabbing Pitts' hands for evidence, and photographing his hands.  The State also introduced several photographs of the interior of Brown's car, including photographs of the passenger side of the vehicle, which Sunaoka testified showed, "small blood-like spots on the seat."  Sunaoka testified that she did not see any "visible stains or blood-like spots" on Pitts' pants, black shirts, shoes, socks, or shoelaces when she photographed them.[2]

Jason Brown testified that his relationship with Pitts was very close, calling Pitts his "family" and "brother." According to Brown, he and Pitts met when Brown was 16 or 17 years old, sometime around 1991.  Brown testified that on

---

[2]     Midway through Sunaoka's testimony, Pitts waived his right to counsel and continued pro se throughout the remainder of the trial.

December 22, 2008, he picked up Pitts in his car to drive to the airport to pick up their mutual friend. On the way, Brown testified, Pitts asked him to make a stop to speak to a person called "Niki," and he pulled over near where Niki lived and parked under a tree.

According to Brown, Pitts got out of the car when they pulled over, and Brown lit a cigarette. Brown testified that he was looking forward and exhaling when he was first hit, which Brown said was within about two minutes of parking. Brown said that he turned and saw Pitts, at which time he put his arms up and began kicking, trying to get away, and he pulled himself out of the driver side window. Brown testified that he was initially stabbed in the neck and then stabbed in the arm when he put his hands up to protect himself. After pulling himself out of the car window, Brown testified, he ran down the hill toward a guard shack holding his bleeding neck and screaming for help. Brown stated that he told the security guards at the guard shack that "[t]here's a black guy up there that just stabbed me." Brown said that he was positive that Pitts was the person who attacked him and that he did not see anyone else on the street.

Brown was transported to Queen's Hospital. When he awoke in the hospital, Brown recalled, Detective Kon was asking him for a statement, and he asked the detective to return later.

At the time Detective Kon returned, Brown continued, he was requesting either a statement or Brown's signature on a paper. Brown stated that he signed the paper although he could not even see or read it because he needed to rest.  Brown also testified that he did not remember speaking with an officer named Jonathan Locey at the hospital, did not remember making statements identifying his assailant as "an older black guy," or remember responding to Officer Locey's questions about whether he knew his assailant and could identify him.

Brown was asked by the prosecutor about a conversation that he purportedly had with Pitts following his release from the hospital:

> [PREOSECUTOR:] Okay.  Let me just--let me just, um, direct your questioning here.
>      So you talked to him.  Did you ever ask him why he stabbed you?
>
> . . . .
>
> [BROWN:] Yes.
>
> [PROSECUTOR:] You asked him, "Why did you stab me?"
>
> [BROWN:] Right.
>
> [PROSECUTOR:] And did he respond?
>
> [BROWN:] His response was, "All I wanted was an apology."
>
> [PROSECUTOR:] I'm sorry?  Can you--
>
> [BROWN:] "All I want is an apology.  Why don't you just apologize."
>
> [PROSECUTOR:] So that's what he told you when he--when you asked him, "Why did you stab me?"
>
> [BROWN:] Right.

> [PROSECUTOR:] Okay. And at that point, when you were
> talking to him, did you already know what he wanted an
> apology for?

Brown explained that he found out after the stabbing "[w]hat [Pitts] wanted an apology for," from "Jamie." The prosecutor then again elicited Brown's account of Pitts' statements regarding the alleged apology:

> [PROSECUTOR:] So when you asked him, "Why did you stab me," he
> said, "All I want is an apology."
>
> [BROWN:] Right.
>
> [PROSECUTOR:] Just apologize.
>
> [BROWN:] He said, "You know what you did. Just apologize."
>
> [PROSECUTOR:] So before you picked the defendant up on
> December 22, 2008, did you know why he was mad at you?
>
> [BROWN:] I didn't know he was mad at me.

The following morning Pitts orally moved to strike all references of an "apology" that the State elicited from Brown. The circuit court agreed with Pitts that leaving the reference to an apology for speculation in the jury's mind was prejudicial to him and asked the prosecutor for any argument or explanation:

> THE COURT: . . . . I will tell you right now, if there had
> been an objection, I would have cut you off at the pass
> because I agree with Mr. Pitts that you're leaving that for
> speculation in the jury's mind is prejudicial to him.
> So do you have--do you have anything you want to add
> or you want to argue this point?
>
> [PROSECUTOR:] Well, Your Honor, I--I--all I wanted to do is
> get out from the victim any conversation he had with the
> defendant regarding the stabbing. And I knew that I wasn't
> going to get into the actual allegations of the rape, and I
> stopped there. And I--
>
> THE COURT: All right.
>
> [PROSECUTOR:]--just didn't think that would be a problem,
> Your Honor.

The judge further agreed with Pitts that the evidence had been precluded. The circuit court granted Pitts' motion to strike the testimony of "an apology for something" and instructed the jury as follows:

> [COURT]: All right. . . . I have an instruction for you at this point.
>       All this testimony yesterday from Mr. Brown having to do with his testimony that the defendant, Mr. Pitts, was in contact with him after the stabbing in this case demanding an apology for something is stricken from the record.
>       I'm striking it from the record. Anything to do with this alleged apology you are to disregard. All right?

Dr. Frederick Yost testified that on the night of the incident he treated Brown for three wounds, the main wound being to Brown's external jugular vein, which was located on the left side of his neck and bleeding intermittently. He testified that the pressure in a vein is lower than in an artery and would tend to flow continuously, and that a vein would theoretically bleed more while a person was lying down or breathing heavier.

Officer Jonathan Locey testified that at about 11:50 p.m. that evening he arrived at Queen's Hospital to obtain a statement from Brown. The officer testified that he located Brown in the emergency room lying down on his back wearing an oxygen mask with his eyes mostly closed and being tended to by staff. According to Officer Locey, he asked Brown who had stabbed him and Brown replied, "An older black guy." Officer Locey said that Brown appeared to nod his head "no" when he asked Brown whether he knew his assailant and appeared to nod

"yes" when asked whether he could identify the person. Officer Locey clarified that Brown never verbally stated that he did not know who stabbed him or that he could recognize his assailant if he saw him again.

Paulette Utu testified that Brown ran to her security guard shack with a bleeding neck. She stated that all Brown said when she got to him was, "Black man, red car. Black man." The State also played a recording of Utu's 911 call in which a voice is heard asking, "So all he's saying is it was a black guy?" to which another voice replies, "Yeah."

David Esaki testified--as an expert in DNA analysis--that he tested stains on a black jacket recovered from Pitts and found blood stains on the sleeve and shoulder. One stain tested positive for blood that matched Brown's DNA, Esaki indicated, and the other stain only revealed a partial DNA profile. Esaki stated that he did not have a reference sample from Pitts to test, and that he did not test Pitts' pants or black shirt for the presence of blood. Esaki further testified that he processed swabs from Pitts' hands and did not find blood, but found DNA from two unknown individuals, one of which was a female.

During his presentation of the evidence, Pitts called Detective Darryl Kon, who testified that he spoke to Brown in the hospital at approximately 7:00 a.m. on the morning following

the stabbing.  Detective Kon testified that Brown "[b]asically [] said, What complaint?  I didn't make a complaint," and that when he returned at a later time Brown did not want to make a statement, and instead "he signed a 172, a withdrawal of complaint."[3]  When asked whether the case was reopened as a result of threats to the department by Brown's father, Detective Kon replied, "It's hearsay.  I wasn't in on that meeting, but that is what I understood."

Pitts in his testimony described his relationship with Brown: "That is my brother.  Literally like a brother from a different mother.  That's my brother."  According to Pitts, on the evening of December 22, 2008, Brown picked him up, and Pitts told him he needed to make a stop to sell drugs.  Pitts stated that when they parked, he got out of the car to look for the person to whom he was supposed to sell the drugs.  However, Pitts testified, he heard a scream and when he got back to the car, Brown looked at him and then headed in one direction, while some other people were headed in a different direction.  Pitts stated that two people were running from the car after the stabbing that night and that one person was a black male wearing a black hoodie.  Pitts stated that he grabbed the jacket from

---

[3]  Detective Kon stated that the second time he visited Brown to get a statement, he told Brown, "I have to get a statement now, get a 172, or I'll be written up for insubordination."

the car and headed down to Kaiser Hospital where he was ultimately encountered by Officer Stuart.

### C. Closing Arguments

In closing argument, the prosecutor suggested that Pitts came up with his defense after reviewing the police reports and the evidence in the case:

> Now, the defendant does not have to put on a case at all. It's the State's burden. After looking at all the facts, after looking at the police reports and the evidence that's in this case, the defendant comes up with an idea. It wasn't me. It was somebody else. I didn't do this.

No objection was made. In his closing argument, Pitts attacked the State's evidence, focusing on the lack of blood found on his person or clothing. Pitts argued that the blood that should be on the passenger's seat of the car "must be on the person that stabbed [Brown]" and that there was no blood on him, no blood on his hands, and no blood on his shirt because he did not commit the stabbing. Pitts further questioned how it would be "humanly possible" for him to "multiply stab somebody and come out with no blood."

Following jury deliberations and before the verdict was returned, the circuit court informed the parties that the jury had requested--via a communication--two pairs of gloves to examine "the pants" that had been admitted into evidence. Pitts and the State did not make an objection. The verdict was then

received, and the jury found Pitts guilty as charged; Pitts was sentenced to life imprisonment with the possibility of parole.

### D. First Appeal and Motions on Remand

Prior to sentencing, Pitts, who had proceeded pro se since midway through the State's case, requested the appointment of substitute counsel to assist him with his post-verdict motions and for sentencing. State v. Pitts(Pitts I), 131 Hawai'i 537, 540, 319 P.3d 456, 459 (2014). The circuit court denied Pitts' request. Id. On appeal, the ICA concluded Pitts' appeal was without merit and affirmed his conviction. Id.

On certiorari review, we held that a defendant who has exercised the right to self-representation at trial but expressly requests counsel for post-verdict motions or for sentencing has a right to counsel. Id. at 543, 319 P.3d at 462. Accordingly, we vacated the ICA's judgment on appeal and remanded the case to the circuit court to allow for the appointment of substitute counsel for the purpose of allowing the filing of a motion for new trial and for resentencing. Id. at 544, 319 P.3d at 463.

On remand, Pitts filed two new trial motions, each of which were later amended.[4] The first motion contended that the

---

[4] At Pitts' request, only the amended version of the motion for new trial based on prosecutorial misconduct was considered; both motions for new trial based on juror misconduct were considered.

prosecutor committed misconduct by (1) arguing that Pitts benefitted from being at trial, (2) commenting on Pitts' testimony, guilt, and credibility as a witness and the credibility of other witnesses, (3) eliciting testimony of a motive that was prohibited in motions in limine, and (4) stating Igawa's description matched Pitts "to a T."[5] Pitts argued that the prosecutorial misconduct denied him a fair trial and was so egregious as to bar reprosecution.

The second motion for new trial was primarily based on juror misconduct. Pitts contended that the jury improperly investigated the clothing he was wearing at the time of his arrest, thereby "supplementing the evidence in the case with an unsubstantiated finding that the clothes had Jason Brown's blood on them," which was contrary to the evidence at trial. Pitts maintained that his constitutional right to a fair trial by an impartial jury was violated by the jury conducting an investigation that was outside of the scope of the evidence presented at trial.

At the hearing, the circuit court initially denied a motion to continue to allow Pitts time to file a motion to recuse the presiding judge. The court also denied the new trial

---

[5] The motion also included arguments that have not been raised on appeal.

motion based on prosecutorial misconduct, finding that there were insufficient grounds to support the motion.

With regard to the motion for a new trial based on juror misconduct, Pitts called one of the trial jurors (Juror no. 9) to testify. Juror no. 9 testified that during deliberations the jurors requested scissors to cut open the packaging containing Pitts' clothing, and three of the jurors examined Pitts' shirt and pants for blood. Juror no. 9 stated that the jurors examined the pants "[f]irst, outside, and then turned inside out." Juror no. 9 testified that the jurors found small spots on the inside of the pants and that the jurors "determined" that the spots "must be blood." However, as to her own belief, Juror no. 9 testified that she did not know what the spots were. According to Juror no. 9, four jurors looked at the stains, including herself.

The circuit court orally denied the motion and in its written order found the following: the jury had properly received for its consideration a pair of pants and a shirt in a sealed plastic bag; the pants and shirt were properly admitted into evidence; the jurors requested and received scissors and gloves to remove and examine the pants and shirt; the jurors examined the pants and shirt on the outside and then inside out; Juror no. 9 observed four jurors examining the pair of pants; the jurors observed three small stains on the pants, but Juror

17

no. 9 did not know what the stains were.  Based on these findings, the court concluded that "[t]he jury was not precluded from examining exhibits during deliberations"; that it was reasonable and diligent for the jury to visually examine the clothing; that the jury did not consider extraneous prejudicial information; and that the defendant failed to show that the jury obtained or used evidence that had not been introduced at trial, and the court denied the motion.[6]

Pitts was sentenced to life imprisonment with the possibility of parole.  Pitts appealed, and the request to transfer the case from the Intermediate Court of Appeals (ICA) to this court was granted on August 10, 2018.  On appeal, Pitts challenges the circuit court's denial of the two new trial motions, the motion to continue, and his pretrial motion to dismiss the indictment.[7]  Pitts also argues that his right to a jury of his peers was violated.

--------

[6]    The court's oral denial of the juror misconduct motion also appeared to include Pitts' argument at the hearing that Juror no. 9 was "pressured" into changing her vote by other jurors.

[7]    The State contends that this court's decision in Pitts I should be considered "law of the case" because Pitts argued in his first appeal that the jury committed misconduct during deliberations and that the circuit court erred in denying his motion to dismiss the indictment, and that this court did not find error on these issues.  The "law of the case" doctrine provides that "a determination of a question of law made by an appellate court in the course of an action becomes the law of the case and may not be disputed by a reopening of the question at a later stage of the litigation."  Hussey v. Say, 139 Hawai‘i 181, 185, 384 P.3d 1282, 1286 (2016).
In Pitts I, we concluded that Pitts' right to post-verdict counsel had been violated, and we vacated the ICA's judgment on appeal and

(continued . . .)

## II.  STANDARDS OF REVIEW

### A. Denial of Motions for New Trial Based on Juror Misconduct and Motion to Dismiss Indictment

A trial court's granting or denial of a motion for new trial, including one premised on juror misconduct, will not be disturbed absent abuse of discretion.  State v. Kim, 103 Hawai'i 285, 290, 81 P.3d 1200, 1205 (2003).  A motion to dismiss an indictment is similarly reviewed for an abuse of discretion. State v. Akau, 118 Hawai'i 44, 51, 185 P.3d 229, 236 (2008).  The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.  Kim, 103 Hawai'i at 290, 81 P.3d at 1205.

### B. Constitutional Violations

Questions of constitutional law are reviewed under the right/wrong standard.  State v. Pratt, 127 Hawai'i 206, 212, 277 P.3d 300, 306 (2012).

---

(. . . continued)

remanded the case to allow for the appointment of substitute counsel for the purposes of filing a motion for new trial and for resentencing.  131 Hawai'i at 544, 319 P.3d at 463.  By doing so, we noted, we sought "to place Pitts in the position he would have been in had the constitutional violation never occurred."  Id. at 544 n.6, 319 P.3d at 463 n.6.  Thus, there was no determination of "law" with respect to the issues presented in this appeal to which the law of the case doctrine may be applied.  We accordingly address the merits of Pitts' appeal.

### III. DISCUSSION

### A. Juror Misconduct

The United States Constitution and the Hawai'i Constitution guarantee the accused in serious criminal cases a fair trial by an impartial jury.[8]  State v. Kim, 103 Hawai'i 285, 290-91, 81 P.3d 1200, 1205-06 (2003).  "Because the right to an impartial jury in a criminal trial is so fundamental to our entire judicial system, it therefore follows that a criminal defendant is entitled to twelve impartial jurors."  State v. Gabalis, 83 Hawai'i 40, 45, 924 P.2d 534, 539 (1996) (quoting State v. Furutani, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994)).  "Thus, the trial court must grant a new trial if any member . . . of the jury was not impartial; failure to do so necessarily constitutes an abuse of discretion."  Id.

On appeal, Pitts contends that it was juror misconduct for three jurors to examine his pants, find bloodlike stains, and change their votes to "guilty" as a result.  This conduct

---

[8]    The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed[.]"  Article I, section 14 of the Hawai'i Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the district wherein the crime shall have been committed[.]"

violated his right to due process, Pitts argues, and the circuit court erred in not granting his motion for a new trial.

## 1. The Jury's Examination of Pitts' Pants Led to the Discovery of New Evidence of "Stains"

Inherent in a defendant's right to a trial by an impartial jury is the requirement that the jury be free from outside influences.  State v. Keliiholokai, 58 Haw. 356, 357-58, 569 P.2d 891, 893-94 (1977).  Accordingly, the jury's verdict must be based upon evidence received in open court and not from outside sources.  Id.; see State v. Chin, 135 Hawaiʻi 437, 447, 353 P.3d 979, 989 (2015) ("Contact between witnesses and jurors is 'generally improper' because it raises a fundamental concern of whether the jury reached 'their verdict based solely on the evidence presented at trial' . . . ." (quoting Dillard v. State, 3 A.3d 403, 408-09 (Md. 2010))).  For, as this court has stated, "The function of the jury in rendering an accurate verdict based on the facts presented at trial is paramount in upholding the truth seeking function of the judicial system."  State v. Flores, 131 Hawaiʻi 43, 56, 314 P.3d 120, 133 (2013) (internal quotations omitted).

Our cases demonstrate that outside influences may improperly taint jury deliberations in a variety of circumstances, including the inadvertent exposure of the jury to items not properly introduced into evidence.  In State v.

21

Estrada, the jury discovered the defendant's fingerprint exemplar, which had been accidentally included in one of the State's exhibits, during deliberations along with the exemplars of two other individuals. 69 Haw. 204, 220-21, 738 P.2d 812, 824 (1987). On appeal, we determined that the defendant's fingerprint exemplar that the jury received was inadmissible evidence of an unrelated crime. Id. at 221, 738 P.2d at 824. The jury was therefore in possession of an item that had not properly been admitted into evidence for the jury's consideration. See id. Because there was no "overwhelming, uncontradicted evidence of guilt," we concluded that the jury's exposure to the inadmissible evidence was not harmless beyond a reasonable doubt. Id.

In State v. Joseph, the jury received for its examination a properly admitted wallet that contained a straw, which had not been independently introduced into evidence, and a list of numbers, which an officer testified was in the wallet but had not otherwise been admitted into evidence. 77 Hawai'i 235, 238-39, 883 P.2d 657, 660-61 (App. 1994). The circuit court had allowed the jury to examine the list but instructed the jury that it could not consider the straw as evidence in reaching its verdict. Id. at 238 n.6, 239-40, 883 P.2d at 660 n.6, 661-62. The ICA held that the trial court properly instructed the jury to not consider the straw in its

22

deliberations because the State had not laid a proper foundation for the straw's introduction, the straw was not in evidence, and exposure to the straw constituted an outside influence. Id. at 238-39, 883 P.2d at 660-61. For these same reasons, the ICA held that the jury was erroneously allowed to examine the list of numbers as it was not properly introduced into evidence. Id. at 238 n.6, 883 P.2d at 660 n.6.

Our cases have also found the sanctity of jury deliberations infringed when a juror's conduct has introduced an outside influence into the jury room. In State v. Williamson, jurors had asked for a dictionary to look up the definitions of the words "entrapment" and "preponderance." 72 Haw. 97, 99, 807 P.2d 593, 595 (1991). After the court denied the request, a bailiff discovered a dictionary in the jury room, and the foreperson was questioned by the trial court as to whether the dictionary was used. Id. at 99-101, 807 P.2d at 595-96. The foreperson responded that the dictionary was not used at all during deliberations because the jury's questions had been clarified the day before the dictionary was brought into the jury room. Id. at 101, 807 P.2d at 595-96. The trial court denied the defense's motion for mistrial and did not question any of the other potentially tainted jurors. Id. at 101, 807 P.2d at 596.

In vacating the trial court's judgment, we noted that the dictionary's definition of "preponderance" differed from the court's instructions. Id. at 104, 807 P.2d at 597. Because the dictionary definition placed a higher burden on the defendant in proving an entrapment defense, this court stated, the defendant would have been substantially prejudiced if any of the jurors could have been influenced by the dictionary's definition. Id. We highlighted the problematic aspect of the juror's conduct, which was the potential to "infect[]" the jury's consideration of information provided by the court with "extraneous" information. See id.; see also Lopez v. Sears Roebuck and Co., 70 Haw. 562, 562-64, 777 P.2d 715, 715-17 (1989) (holding that it was improper for the jury foreperson to conduct an unauthorized, independent observation of the defendant's assembly process and report his observations to the jury).

Just as the law requires that items exposed to the jury must have been properly received in evidence in open court, our caselaw has defined the limits of acceptable jury conduct when examining exhibits in evidence. In State v. Pauline, during trial, but outside the presence of the court and counsel, the jury was allowed to view a vehicle's trunk that the defendant had allegedly used to transport the victim. 100 Hawai'i 356, 362-63, 60 P.3d 306, 312-13 (2002). At the viewing, the trunk hood was opened and closed by detectives at the

24

jurors' request.  Id. at 363, 60 P.3d at 313.  On appeal, the defendant argued that the jury had conducted an improper experiment in violation of his due process rights.  Id. at 379, 60 P.3d at 329.

In demarcating the line between acceptable and improper jury conduct with regard to exhibits in evidence, this court stated that the jury may "carry out experiments within the lines of offered evidence or which amount to no more than a careful examination of the evidence which was presented in court."  Id. at 380, 60 P.3d at 330 (internal quotations omitted) (quoting People v. Cooper, 95 Cal.App.3d 844, 853-54 (1979)).  We explained that experiments are generally prohibited "where the result is the production of 'new' evidence" for which it "is not possible for the party injured to meet, answer, or explain."  Id. at 379, 60 P.3d at 329 (quoting Cooper, 95 Cal.App.3d at 853).  Analyzing the facts in Pauline against this standard, we found that "the only potential bearing [that] the 'experiment' had on [the defendant's] guilt was whether [the victim's] body could fit in the trunk," and the jury had already viewed the trunk without the trunk cover, photographs of the trunk with the hood closed, and the dimensions of the trunk as evidence.  Id. at 380, 60 P.3d at 330.  Thus, we concluded, the opening and closing of the hood did not produce new evidence.  Id.

As our holding in Pauline illustrates, the critical inquiry with regard to a jury's examination of evidence is whether the jury's conduct resulted in the production of new evidence.  See id. at 379, 60 P.3d at 329.  This court's decisions have thus vigilantly protected the integrity of jury deliberations against the risk of outside influences.

In the present case, Juror no. 9 testified that four jurors, including herself, asked for a pair of scissors, cut open the evidence bag containing Pitts' pants, examined the pants on the outside and then inside out, and found three small stains on the inside.  Juror no. 9 testified that they did this because they "were looking for blood" on the pants and that their examination resulted in the discovery of "small drops, and they determined it must be blood."  In its findings of facts, the circuit court found that the jurors asked for and received a pair of gloves for a closer examination of the pants and shirt; examined the pants on the exterior side and then inside out; four jurors were observed by Juror no. 9 examining the pants; and that these jurors observed three small stains on the pants.[9]

---

[9]     The circuit court in its conclusions of law cited State v. Kassebeer, 118 Hawai'i 493, 506, 193 P.3d 409, 422 (2008), for the proposition that "[t]he jury is not precluded from examining exhibits during deliberations."  The issue in Kassebeer dealt with whether the court erred in the first instance by allowing a weapon in the jury room.  See id.

Unlike the examination of the trunk in Pauline, here the jury's examination resulted in the discovery of new evidence in the form of three small stains on the pants which introduced an outside influence that could have tainted the jurors' impartiality. During trial in this case, there was no evidence that blood was found on Pitts or on the clothes that he was wearing. Because the jurors were actively trying to supplement the evidence presented at trial with information not provided at trial or by the court, the jurors' actions were similar to the actions taken by jurors in Lopez and Williamson. See Lopez, 70 Haw. at 564, 777 P.2d at 717 (jury foreperson conducted an unauthorized view of the defendant's store and related his observations to the jury); Williamson, 72 Haw. at 103, 807 P.2d at 596 (juror improperly obtained definitions differing from those supplied by the court). Thus, the jurors' examination was neither within the lines of offered evidence nor merely cumulative to the evidence already presented at trial. See Pauline, 100 Hawai'i at 380, 60 P.3d at 330.

Further, because the evidence was discovered for the first time during jury deliberations, it was evidence that had not been presented in court, for which no foundation had been laid, and which had not been properly admitted into evidence. See Estrada, 69 Haw. at 221, 738 P.2d at 824; Joseph, 77 Hawai'i at 239, 883 P.2d at 661. Therefore the stains were an outside

27

influence and constituted evidence that Pitts did not have the opportunity to meet, answer, or explain.[10]  See Pauline, 100 Hawaiʻi at 379-80, 60 P.3d at 329-30.

In a Florida case with analogous facts to this case, Williams v. State, a witness saw a man break the window of a business with his "naked hand" and reported the crime.  448 So.2d 49, 50 (Fla. Dist. Ct. App. 1984).  The defendant was arrested shortly thereafter and identified as the suspect by the witness.  Id.  At the time of his arrest, the defendant was wearing gloves, which were received into evidence.  Id.

During trial, the defendant's defense was that he was misidentified because the person who broke the window would have injured and bloodied his hand, and there was no evidence that the defendant's hand was injured or bleeding at the time of the arrest.  Id.  However, during jury deliberations, the jury discovered a piece of paper with a stain on it in one of the fingers of the glove and asked the trial court whether they could consider the "bloody piece of paper" in their

---

[10]  As our cases provide, the jury's receipt of an outside influence is not to be condoned merely because the vehicle for its discovery is properly admitted evidence.  By way of analogy, if the jurors in this case had presented their discovery to the court and asked if they could consider the stains in their deliberations, the circuit court, as in Joseph, would have been required to specifically instruct the jurors that they could not.  See Joseph, 77 Hawaiʻi at 238, 883 P.2d at 660 ("The law requires that items exposed to the jury must have been properly received in evidence in open court.  In our view, the straw was not properly received in evidence." (citation omitted)).

deliberations. Id. The trial court denied defense counsel's motion for mistrial and allowed the jury to consider the paper it had found. Id.

On appeal, the appellate court found that the jury's discovery of the stained paper was "a total surprise with no opportunity for discovery, defense or cross-examination as to it." Id. The appellate court noted that the paper was never tested to determine whether the stain was blood, and if it was blood, whether the blood belonged to the defendant. Id. Further, the appellate court concluded that "[t]he 'bloody' paper effectively destroyed [the defendant's] closing argument, and his counsel had no opportunity to even try to rebut or explain it, even had [counsel] been in a position to do so." Id.

As in Williams, the stains on Pitts' pants were first discovered by the jury, the stains were not tested "to determine if the stain[s] [were] blood and, if blood, that it was [Brown's] blood." Id. Under our caselaw, the jurors were exposed to an outside influence not presented at trial, which Pitts did not have the opportunity to meet, answer, or explain. See Pauline, 100 Hawai'i at 379, 60 P.3d at 329. The circuit court thus erred in finding the jurors' conduct permissible merely because the pants had been received in evidence, failing to recognize the misconduct in discovering the stains, and

concluding that the jury was not exposed to an outside influence.

### 2. The Jury's Discovery of "Stains" on Pitts' Pants Was Not Harmless Beyond a Reasonable Doubt

"If the jury conducts an experiment that produces 'new' evidence, the court must then examine whether the defendant was thereby denied his or her right to a fair trial by an impartial jury."  Pauline, 100 Hawai'i at 380, 60 P.3d at 330 (citing Keliiholokai, 58 Haw. at 358, 569 P.2d at 893-94).

We have previously stated that a rebuttable presumption of prejudice is raised when the nature of an outside influence is such that it "could" substantially prejudice the defendant's right to a fair trial.  See Williamson, 72 Haw. at 102, 807 P.2d at 596; Lopez, 70 Haw. at 564, 777 P.2d at 717. "To overcome the presumption of prejudice, the State must prove that the outside influence on the jury was harmless beyond a reasonable doubt."  State v. Chin, 135 Hawai'i 437, 448, 353 P.3d 979, 990 (2015).  This requires the trial court to investigate the totality of the circumstances to determine the impact of the outside influence on the jury's impartiality.  Id. at 443, 353 P.3d at 985.

In Williamson, this court determined that the defendant would have been substantially prejudiced if "any" of the jurors could have been influenced by the dictionary

definition of "preponderance." 72 Haw. at 104, 807 P.2d at 597.
Because the trial court only questioned the foreperson, we
concluded, the court could not be sure that the juror who
brought in the dictionary was not affected by independently
looking up the word. Id. Further, we were not convinced that
no other jurors were potentially influenced by the extraneous
definition considering that a juror felt it necessary to bring
the dictionary into the jury room. Id. Similarly, in Lopez,
although it was not clear that the foreperson's investigation
and comments to other jurors affected the verdict, we concluded
that the foreperson's actions could have influenced the outcome
of the case, requiring a new trial. 70 Haw. at 564, 777 P.2d at
717.

This court has reached the same conclusion in cases in
which only one juror's impartially has been potentially tainted
by an outside influence. In State v. Chin, the jury foreperson
approached one of the defendant's witnesses, inquired about the
possibility of employment, and handed the witness his business
card. 135 Hawaiʻi at 440-41, 353 P.3d at 982-83. The witness
had no further communication with the foreperson and related the
encounter to defense counsel. Id. We concluded that the
contact between the foreperson and the defendant's witness was
an outside influence that could have substantially prejudiced
the defendant. Id. at 447-48, 353 P.3d at 989-90. Because the

trial court failed to conduct an inquiry into the totality of the circumstances, we held that there was no showing by the State that such misconduct was harmless beyond a reasonable doubt.  Id. at 449, 353 P.3d at 991.

In this case, Pitts' defense focused on the lack of evidence indicating that blood was found on his person or the clothing that he wore the night of the stabbing.  Pitts repeatedly cross-examined the State's witness about whether they had noticed blood on his person or clothing on the night of the stabbing, and he argued during closing arguments that the blood that should be on the passenger seat "must be on the person that stabbed [Brown] because it ain't on that seat."  Pitts contended that the lack of blood found on him and his clothing showed that he was not the person who attacked Brown.  Thus, the nonexistence of the evidence of blood on Pitts' clothing was essential to his defense and credibility.

The jury had heard testimony and seen photographs that, though the majority of the blood was on the driver's side, there were small blood-like spots on the passenger seat.  From this evidence, the jurors could have inferred that if Pitts were the attacker, as the State contended, then there might be blood on his clothing.  Juror no. 9's testimony that the jurors were actively searching Pitts' clothes for blood confirms the likelihood of this inference.

32

Having found three small stains on the inside of Pitts' pants, the jurors could have concluded--as Juror no. 9's testimony suggests that they did--that the stains on Pitts' pants were blood. This in turn would have had the effect of completely undermining Pitts' defense and credibility. The harm from this discovery cannot be overstated given that the stains were not tested "to determine if the stain[s] [were] blood and, if blood, that it was [Brown's] blood." Williams v. State, 448 So.2d 49, 50 (Fla. Dist. Ct. App. 1984).

Further, the evidence of Pitts' guilt was not overwhelming. No weapon was recovered and no evidence was presented of blood found on Pitts' person or the clothing he was wearing. Because Brown was the only person that positively identified Pitts as the attacker, this case depended heavily on the credibility of Brown and Pitts, negating against a finding of harmlessness. Cf. State v. Underwood, 142 Hawai'i 317, 329, 418 P.3d 658, 670 (2018) ("When a conviction is largely dependent on a jury's determination as to the credibility of a complainant's testimony, we have held that the evidence of the offense is not so 'overwhelming' that it renders the prosecutor's improper statements harmless beyond a reasonable doubt.").

The State argues that the discovery of the stains was duplicative of the evidence presented at trial inasmuch as blood

was found on Pitts' jacket. However, Pitts testified that he grabbed the jacket from the car after the stabbing and there is no persuasive evidence of the assailant wearing a jacket at the time of the stabbing.[11] Accordingly, the stains on Pitts' pants viewed by the jurors were not cumulative evidence but instead resulted in the likely inference that the stains were of Brown's blood.

Accordingly, the evidence and arguments presented at trial and Juror no. 9's testimony that the jurors were looking for blood on Pitts' clothing, all indicate that the discovery of the three stains on the inside of Pitts' pants could have potentially tainted the impartiality of any or all of the four jurors exposed to the stains, thereby significantly prejudicing Pitts' defense.[12] Based on the totality of the circumstances in

---

[11] The State's argument is premised on the assumption that Pitts was wearing the jacket at the time of the offense. Igawa testified that the person he described getting out of the car was wearing what "looked like a long black sweater of some sort," and his 911 phone call, which was played for the jury, indicates that he identified the possible suspect as wearing a "long-sleeve black shirt." The clothing that Pitts was arrested wearing included two black shirts, one long and one short, and Igawa did not testify about the jacket admitted into evidence. Igawa's testimony thus does not resolve whether Pitts or anyone else was wearing the jacket during the offense.

The State also argues that the lack of blood on Pitts' clothing was not persuasive in light of Dr. Yost's testimony regarding Brown's wounds. However, the jury's discovery of the stains, if inferred to be blood, did more than affect the persuasiveness of Pitts defense: it directly contradicted and "effectively destroyed" it. Williams, 448 So.2d at 50.

[12] The circuit court having found no misconduct, did not seek to question whether any of the other three jurors who had examined the stains could have been influenced by what they viewed or whether any of the other jurors could have been potentially influenced.

this case, it cannot be said that the jury's exposure to the stains on Pitts' pants was harmless beyond a reasonable doubt.[13]

### B. Prosecutorial Misconduct

It is the prosecutor's "duty to seek justice, to exercise the highest good faith in the interest of the public and to avoid even the appearance of unfair advantage over the accused." State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Quitog, 85 Hawai'i 128, 136 n.19 938 P.2d 559, 567 n.19 (1997)).

Pitts asserts that multiple instances of prosecutorial misconduct occurred, and the circuit court thus erred in denying his new trial motion on this ground.[14]

### 1. Eliciting Inadmissible Evidence of an Apology in Violation of the Circuit Court's Motion in Limine Ruling

Pitts asserts that the prosecutor elicited inadmissible evidence of a motive in violation of the circuit court's motion in limine ruling. In State v. Pacheco, during

---

[13] Pitts also argues that his motion for new trial should have been granted because Juror no. 9 voted guilty based on coercion by other jurors. In light of our disposition regarding the motion for new trial based on juror misconduct, we do not address the contention as to juror coercion. For the same reason, we also do not address whether the circuit court erred when it denied the motion to continue.

[14] Pitts argues that the prosecutor committed the following instances of misconduct: (1) improperly eliciting inadmissible evidence, (2) improperly commenting on Pitts' right to be present at trial, (3) improperly commenting on the credibility of witnesses, and (4) distorting, manipulating, and misrepresenting evidence at trial and during closing arguments. In light of our disposition in Part III.A, supra, we address Pitts' first two contentions to provide guidance to the parties and the court on remand.

motions in limine, the defense sought to exclude any evidence of prior criminal convictions. 96 Hawai'i 83, 88-89, 26 P.3d 572, 577-78 (2001). The circuit court ruled that the prosecutor could refer to a specific theft arrest and conviction but could not refer to it as "a crime of dishonesty." Id. at 89, 26 P.3d at 578. Nevertheless, the prosecutor asked the defendant during cross-examination, "Why should this jury . . . believe a thief like you." Id. at 91, 26 P.3d at 580. And, during closing arguments, the prosecutor twice referred to the defendant's prior theft crime as "a crime of dishonesty" and argued that there was no reason for the jury to believe "a convicted thief." Id. at 92, 26 P.3d at 581. On appeal, we stated that the prosecutor had committed misconduct by violating the circuit court's express in limine ruling. Id. at 98-99, 26 P.3d 587-88; see also State v. Pemberton, 71 Haw. 466, 473-77, 769 P.2d 80, 83-85 (1990) (holding that it was misconduct for prosecutor to attempt to introduce inadmissible evidence despite the trial court repeatedly sustaining defense counsel's objections).

In this case during motions in limine the circuit court precluded the State from introducing evidence that after Pitts' initial release from custody, Pitts accused Brown of sleeping with his girlfriend and asked for an apology. The circuit court concluded that the probative value of an alleged motive related to Pitts asking for an apology was outweighed by

the danger of unfair prejudice to the defendant.  However, the prosecutor specifically directed the questioning to elicit from Brown testimony regarding the reason for the stabbing, and the term "apology" or "apologize" was used in succession eight times by the prosecutor and Brown in reference to that reason.

The circuit court confirmed the impropriety of the prosecutor's line of questioning when Pitts objected the following day, stating that it would have sustained an objection if one had been made because the prosecutor's questioning was "leaving that for speculation in the jury's mind [and it was] prejudicial to him."  In other words, the questions regarding an apology allowed the jury to infer that Pitts had a reason for stabbing Brown.  When the court asked the prosecutor to explain the basis of the questioning, the prosecutor stated that "all I wanted to do is get out from [Brown] any conversation he had with [Pitts] regarding the stabbing" and not to get into the "actual" allegations of rape.  Yet obtaining any conversation regarding the stabbing circumvented the court's in limine ruling to preclude any testimony regarding an apology.  The court thereafter sought to cure the prejudice by instructing the jury that testimony of the previous day as to Pitts "demanding an apology" and "[a]nything to do with this alleged apology" was to be disregarded; however, the cautionary instruction may have

only had the effect of highlighting that the "apology" had been demanded "for something."

The nature of the prosecutor's line of questioning was particularly problematic because the inferences taken from the testimony concerned the main issue in the case: the identity of Brown's attacker.[15] Brown was the only person who positively identified Pitts as the assailant, but Pitts testified that a third, unidentified black male committed the stabbing. Given this conflicting testimony, the State's most difficult hurdle in its case against Pitts was convincing the jury that Pitts suddenly and without reason attacked his friend of almost twenty years.[16] The testimony of an alleged apology invited the jury to infer that Pitts had a motive to stab Brown, making Brown's testimony regarding the attacker's identity more believable. In turn, speculation about an alleged apology would weigh heavily on Pitts' credibility and impair his defense.

---

[15] The State argues that this was not misconduct because the prosecutor did not elicit testimony that Pitts accused Brown of sleeping with Pitts' girlfriend. However, the circuit court ruling clearly precluded the State from eliciting testimony that Pitts demanded an apology after his release from custody without regard to its substance. As the court's comments and cautionary instruction make evident, the alleged apology had to be for "something" and that something in the jury mind's was likely Pitts' motive.

[16] Similarly damaging to Pitts was the inference that he had a reason to be "mad" at Brown before the stabbing, which could be inferred from the Prosecutor's question to Brown, "So before you picked the defendant up on December 22, 2008, did you know why he was mad at you?" (Emphasis added.)

Because of our determination regarding the motion for a new trial based on the juror misconduct, we need not determine whether this introduction of inadmissible evidence would require granting Pitts a new trial. We emphasize, however, the obligation of counsel to comport with rulings of the court and "to avoid even the appearance of unfair advantage over the accused." Rogan, 91 Hawai'i at 412, 984 P.2d at 1238.

## 2. Improper Statement on Pitts' Right to Review Evidence and Prepare a Defense

Pitts also contends that the prosecutor improperly argued that "[Pitts] listened to the testimony and then came up with his" defense because this argument "d[id] not tie Pitts' testimony in with any other evidence in the case."[17]

Generally, a prosecutor has wide latitude on commenting on the evidence during closing argument, including drawing reasonable inference from the evidence. State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014). "Because the prosecutor's argument is likely to have significant persuasive force with the jury, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct." Id. at

---

[17] While Pitts frames this argument as a comment on Pitts' right to be present at trial, we address only the general propriety of the prosecutor's statement.

115, 319 P.3d at 1123 (internal quotations omitted) (quoting

State v. Klinge, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000)).

Therefore, a prosecutor's comment on matters "outside the

evidence" is improper.  State v. Walsh, 125 Hawai'i 271, 290, 260

P.3d 350, 369 (2011) (quoting State v. Tuua, 125 Hawai'i 10, 14,

250 P.3d 273, 277 (2011)).  And a prosecutor's comments may not

infringe on a defendant's constitutional rights.  Id. at 284,

260 P.3d at 363.

        Here, the prosecutor contended that Pitts'

identification defense was the result of Pitts having reviewed

the police reports and the evidence in the case:

> Now, the defendant does not have to put on a case at all.
> It's the State's burden.  After looking at all the facts,
> after looking at the police reports and the evidence that's
> in this case, the defendant comes up with an idea.  It
> wasn't me.  It was somebody else.  I didn't do this.

Thus, according to the prosecutor, Pitts had "come[] up" with

the "idea" of his identification defense based on his review of

the police reports in the case and after "looking at all the

evidence that's in the case."  Not only was there no evidence

presented at trial from which the prosecutor could have

reasonably inferred that Pitts' identification defense

originated after or as a result of reviewing the police reports

and the evidence in the case, but more fundamentally such

40

comments are a clear infringement on a defendant's constitutional right to prepare and present a defense.[18]

This court has stated on numerous occasions that "[c]entral to the protections of due process is the right to be accorded a meaningful opportunity to present a complete defense." State v. Tetu, 139 Hawaiʻi 207, 219, 386 P.3d 844, 856 (2016) (alterations in original) (quoting State v. Kaulia, 128 Hawaiʻi 479, 487, 291 P.3d 377, 385 (2013)). It is well established that "all defendants must be provided with the basic tool[s] of an adequate defense." Id. (internal quotations omitted) (alteration in original) (quoting State v. Scott, 131 Hawaiʻi 333, 352, 319 P.3d 252, 271 (2013)). An essential component of the basic tools is the process of discovery, which promotes "fairness in [our] adversary system." Id. (quoting State v. Valeros, 126 Hawaiʻi 370, 379, 271 P.3d 665, 674 (2012)); see also Hawaiʻi Rules of Penal Procedure Rule 16 (2012) (requiring the disclosure of prescribed materials by the prosecution and defense); Ake v. Oklahoma, 470 U.S. 68, 77 (1985) ("[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain

---

[18]    The State concedes that, "[n]aturally, a defendant would look at all the facts, including police reports and evidence the prosecution obtained in forming a defense."

that [the defendant] has access to the raw materials integral to the building of an effective defense.").

The State acknowledges that the prosecutor in this case "referred to all facts, police reports and evidence in this case" but maintains that "[i]nsofar as there was no reference to Pitts' right to be present at trial, there was no misconduct." However, the prosecutor's comments were an attack on Pitts for being a defendant as it penalized him for reviewing the police reports and evidence in the case and for the defense raised.[19] See Basham, 132 Hawaiʻi at 118, 319 P.3d at 1126 ("Generic arguments by the prosecutor that defendants, by virtue of being defendants, have no reason to tell the truth or have the greatest incentive to lie also transform a defendant's decision to testify at trial into an 'automatic burden on . . . credibility.'" (alteration in original)).

---

[19]    As we explained in Walsh:

> [T]he prosecution is free to refer to the specific inconsistencies and contradictions in a defendant's testimony or with other evidence, without referring to [the defendant's right to review the evidence presented against the defendant].  Even in cases where there are no inconsistencies, the "close or perfect symmetry between a defendant's testimony and other witnesses' testimony, or other evidence of tailoring, may prompt the jury's scrutiny."  [State v. Daniels, 861 A.2d 808, (N.J. 2004)].  Prosecutors may already cite to specific facts indicating a defendant's lack of trustworthiness; there is no reasonable justification for placing a tailoring burden on testimony.

Walsh, 125 Hawaiʻi at 295, 260 P.3d at 374.

The prosecutor's argument in this case thus wrongly infringed on Pitts' constitutional right to conduct discovery, present a defense, and be afforded a fair trial. See State v. Davis, 63 Haw. 191, 196, 624 P.2d 376, 479 (1981) (the enlargement of pretrial discovery under the penal rules is "designed to enhance the search for truth in the criminal trial"). Because of our disposition in this case, we need not determine whether the improper closing argument constituted plain error.

### C. Denial of Right to Jury of Peers

Pitts asks this court to review as plain error his assertion that he was denied his right to a jury of his peers when a prospective juror who expressed concern about the lack of African-Americans in the jury pool was peremptorily dismissed.[20]

Article I, section 5 of the Hawai'i Constitution guarantees a criminal defendant the equal protection of law.[21]

---

[20]    We do not address Pitts' argument that African-Americans were systematically excluded from the jury list as the record in this case is clearly insufficient to support this assertion.

[21]    Article I, section 5 of the Hawai'i Constitution provides as follows:

> No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

State v. Batson, 71 Haw. 300, 302, 788 P.2d 841, 842 (1990). As such, "[i]t is impermissible to exercise peremptory challenges in a manner which discriminates on the basis of such categories as race, religion, ancestry, or gender." State v. Daniels, 109 Hawaiʻi 1, 5, 122 P.3d 796, 800 (2005) (Caucasian males); see State v. Levinson, 71 Haw. 492, 795 P.2d 845 (1990)) (women); Batson, 71 Haw. at 302, 788 P.2d at 842 (same ethnic minority as defendant). Our precedent requires that the defendant first make a prima facie showing that "the challenged juror is a member of a protected group, that the opposing party exercised a peremptory challenge to remove the juror, and that the facts and circumstances surrounding the exercise of the peremptory challenge raise an inference of discrimination." Daniels, 109 Hawaiʻi at 5, 122 P.3d at 800.

In this case, the juror was allegedly excused based not on her ethnicity, gender, or membership in another protected group, but rather on her expression of concern about the lack of African-Americans in the jury venire. Our caselaw does not prohibit peremptory challenges against jurors unless the challenge is based on the prospective juror's membership in a protected group. Nonetheless, a court's inherent authority to administer justice would likely allow intervention when the specific circumstances of a peremptory challenge threatened the integrity of the judicial system. Cf. Alakaʻi Na Keiki, Inc. v.

Matayoshi, 127 Hawai'i 263, 283, 277 P.3d 988, 1008 (2012) ("[A]lthough the exact nature of the 'judicial power' is not defined in the constitution [of Hawai'i], the 'inherent power of the court is the power to protect itself[ and] the power to administer justice whether any previous form of remedy has been granted or not . . . ." (quoting State v. Moriwake, 65 Haw. 47, 56, 647 P.2d 705, 712 (1982))).

Thus, a court concerned that a peremptory challenge exercised upon a prospective juror appears to discriminate on a prohibited basis has the authority to request that counsel provide a reason for the exercise of the challenge. See Levinson, 71 Haw. at 499, 795 P.2d at 849 (holding that the right to serve on a jury "cannot be taken away for any of the prohibited bases of race, religion, sex or ancestry"); Matayoshi, 127 Hawai'i at 283, 277 P.3d at 1008.

### D. Denial of Motion to Dismiss Indictment

"[W]here evidence of a clearly exculpatory nature is known to the prosecution, such evidence must be presented to the grand jury." State v. Bell, 60 Haw. 241, 245, 589 P.2d 517, 520 (1978).

Pitts argues that evidence that Brown did not initially identify Pitts as his attacker was clearly exculpatory and should have been presented to the grand jury. Although

45

Brown may have initially indicated that he did not know his attacker, he subsequently identified Pitts as the assailant. The State also presented the testimony of Igawa--whose testimony before the grand jury identified Pitts as the attacker[22]--as well as the testimony of Officer Campbell, who assisted in arresting Pitts after the incident.  While Brown's failure to initially identify Pitts as his attacker may bring into question Brown's credibility, this evidence is not clearly exculpatory in light of the other evidence presented to the grand jury that inculpated Pitts, particularly Brown's subsequent identification of Pitts.  See Bell, 60 Haw. at 253, 589 P.2d at 524-25 (concluding that the victim's failure to identify the defendant at the lineup reflected on the victim's believability but was not clearly exculpatory because the victim previously identified the defendant outside the police station).  Therefore, the circuit court did not err in denying Pitts' motion to dismiss the indictment.

## IV.  CONCLUSION

Because it cannot be said that the several jurors' discovery of the stains on Pitts' pants during deliberations was harmless beyond a reasonable doubt, we vacate the circuit

---

[22]     As previously noted, Igawa's identification of the assailant was precluded at trial, but his description of the person was permitted.  See supra Part I.A.

46

court's Judgment of Conviction and Sentence, filed November 9, 2016, and remand the case to the circuit court for further proceedings consistent with this opinion.

Walter R. Schoettle
for appellant

Sonja P. McCullen
for appellee

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

